[Civ. No. 13742. Third Dist. Feb. 28, 1973.]

CENTRAL BANK, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
DESERT PALMS LANDS et al., Real Parties in Interest.

[Civ. No. 13596. Third Dist. Feb. 28, 1973.]

CENTRAL BANK et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
RANCHO RIVIERA INVESTMENTS et al., Real Parties in Interest.

(Consolidated Cases.)

## COUNSEL

Fitzsimmons & Hawthorne and Anthony Hawthorne for Petitioners.

No appearance for Respondent.

Dahl, Hefner, Stark, Marois & James and Robert W. Bell for Real Parties in Interest.

## OPINION

**FRIEDMAN, Acting P. J.**—In these two mandate proceedings Central Bank, a national bank, invokes section 94 of title 12, United States Code, which provides: "Actions and proceedings against any association under this chapter may be had in any district or Territorial court of the United States held within the district in which such association may be established, or in any State, county, or municipal court in the county or city in which said association is located having jurisdiction in similar cases."

Having been named as one of a group of defendants in two separate but similar lawsuits in the Superior Court of Sacramento County, the bank moved for changes of venue to Alameda County, the location of its main office and principal place of business. The motions were denied and the bank filed the present actions, requesting us to order the changes of venue. (Code Civ. Proc., § 400.) In this opinion we consolidate the two mandate proceedings for decision.

██ The venue direction of section 94 is mandatory. (*Mercantile Nat. Bank* v. *Langdeau* (1963) 371 U.S. 555, 562 [9 L.Ed.2d 523, 529, 83 S.Ct. 520]; *Monarch Wine Co.* v. *Butte* (1952) 113 Cal.App.2d 833, 839 [249 P.2d 291].) It does not extend to local, in rem actions. (*Casey* v. *Adams* (1880) 102 U.S. 66 [26 L.Ed. 52].) A number of decisions adhere to the proposition that a national bank is "located" only at its principal place of business as set forth in its charter.[1] ██ The venue privilege of

---

[1]E.g., *United States National Bank* v. *Hill* (9th Cir. 1970) 434 F.2d 1019, 1020; *Buffum* v. *Chase Nat. Bank of City of New York* (7th Cir. 1951) 192 F.2d 58, 60, certiorari denied 342 U.S. 944 [96 L.Ed. 702, 72 S.Ct. 558]; *Leonardi* v. *Chase Nat. Bank of City of New York* (2d Cir. 1936) 81 F.2d 19, 22, certiorari denied 298 U.S. 677 [80 L.Ed. 1398, 56 S.Ct. 941]; *Ebeling* v. *Continental Illinois Nat. Bank & Trust Co.* (1969) 272 Cal.App.2d 724, 726-727 [77 Cal.Rptr. 612] (dictum).

national banks is a personal one, which may be waived; state courts are competent to inquire and decide whether a waiver has occurred.[2] Some courts hold the bank to an implied waiver by local participation in the transactions giving rise to the lawsuit; others reject that position.[3] Some view the establishment of a branch bank in the locality (usually in combination with other local activities) as a waiver of the right to be sued elsewhere.[4] Other courts disagree, holding that expansion into branch banking activity does not debilitate the bank's privilege to be sued only at its home office.[5]

The briefs debate two questions: first, whether the superior court lawsuits are local or transitory; second, whether the bank waived its venue privilege. In these actions separate groups of plaintiffs allege that they were victims of a fraudulent "investment conspiracy," resulting in their purchase of overvalued limited partnership interests in separate apartment house developments or in the underlying real estate. The defendants are the project developers, real estate brokers and financing institutions. The litigation files reveal that Central Bank had originally financed construction of the apartment houses and had held first deeds of trust and assignments of rent as security. The bank sold the loans and assigned its security interests to other financial institutions before the lawsuits were filed. The plaintiffs seek receiverships, restraints on the exercise of default privileges, rescission of their purchase of participating interests, adjudication of title to the property, general and punitive damages. These various kinds of relief are sought from Central Bank as well as the other defendants.

█ The lawsuits are not local, not in rem, but transitory. An in rem action seeks to adjudicate interests in property or in a status; an in personam suit, to establish personal liability. (*Estate of Radovich* (1957) 48 Cal.2d

[2]*Michigan Nat. Bank* v. *Robertson* (1963) 372 U.S. 591, 594 [9 L.Ed.2d 961, 963, 83 S.Ct. 914]; *Michigan Nat. Bank* v. *Superior Court* (1972) 23 Cal.App.3d 1 [99 Cal.Rptr. 823].

[3]See *Michigan Nat. Bank* v. *Superior Court, supra,* 23 Cal.App.3d at pages 10-12, and cases cited; Annotation 1 A.L.R.3d 904-908.

[4]*Reaves* v. *Bank of America* (S.D.Cal. 1973) 352 F.Supp. 745; *Helco, Inc.* v. *First National City Bank* (D. Virgin Islands 1971) 333 F.Supp. 1289; *Frankford Supply Co.* v. *Matteo* (E.D.Pa. 1969) 305 F.Supp. 794, 796; *Lapinsohn* v. *Lewis Charles, Inc.* (1968) 212 Pa.Super. 185 [240 A.2d 90, 94-95], certiorari denied 393 U.S. 952 [21 L.Ed.2d 363, 89 S.Ct. 376].

[5]*United States National Bank* v. *Hill, supra,* 434 F.2d 1019; *American Surety Co.* v. *Bank of California* (9th Cir. 1943) 133 F.2d 160, *Leonardi* v. *Chase Nat. Bank of City of New York, supra,* 81 F.2d 19, certiorari denied 298 U.S. 677; *General Electric Credit Corp.* v. *James Talcott, Inc.* (S.D.N.Y. 1966) 271 F.Supp. 699; *International Refugee Org.* v. *Bank of America, etc.* (S.D.N.Y. 1949) 86 F.Supp. 884; *Prince* v. *Franklin National Bank* (1970) 62 Misc.2d 855 [310 N.Y.S.2d 390].

116, 120 [308 P.2d 14]; *Title etc. Restoration Co.* v. *Kerrigan* (1906) 150 Cal. 289, 308 [88 P. 356].) Primary objectives of the present lawsuits are damages and rescission of the purchase of limited partnership interests. One segment of the prayer, seeking settlement of the parties' property interests, is subordinate to the main relief and does not alter the lawsuits' essentially transitory character. (*Ebeling* v. *Continental Illinois Nat. Bank & Trust Co., supra,* 272 Cal.App.2d at p. 727.) The plaintiffs want to rid themselves of property interests, not establish them. "By its very nature, this is a considerably different kind of suit from the one to determine interests in property at its situs which was involved in *Casey* v. *Adams.*" (*Michigan Nat. Bank* v. *Robertson, supra,* 372 U.S. at p. 594 [9 L.Ed.2d at p. 963].)

■ A national bank's venue privilege may be waived by lack of timely assertion. (*First Nat. Bank of Charlotte, North Carolina* v. *Morgan* (1889) 132 U.S. 141 [33 L.Ed. 282, 10 S.Ct. 37].) ■ Early in both lawsuits Central Bank and the other defendants stipulated to the appointment of a receiver to manage the apartment houses, receive rents and pay current obligations. In response to the stipulation, the Sacramento Superior Court appointed a single receiver to take charge of the properties involved in both lawsuits. The plaintiffs view the bank's assent to the Sacramento court's receivership order as a waiver of its venue privilege. We decline so to hold. The bank was present in the lawsuit primarily to respond to the plaintiffs' damage claims. It had sold its security interests in the buildings, land and rents and had no real interest in the other parties' interim management concerns. The receivership was an orderly and sensible arrangement resolving a problem pendente lite. Aside from preserving its venue position, the bank had no valid reason to burden the other parties or the court with resistance to the receivership. The courts should not transform this sensible, interim arrangement into a jurisdictional trap. The bank's participation in the stipulation did not waive its federally bestowed privilege.

We take judicial notice, as a matter of common knowledge in this locality, that Central Bank operates a branch bank in downtown Sacramento through which it conducts a general banking business in the County of Sacramento. (Evid. Code, § 452, subd. (g).) As we understand the facts, the Central Bank's main office in Alameda County, not its Sacramento branch, financed construction of the Sacramento apartment houses involved in the two lawsuits. Although independent of each other, the two kinds of activity—the conduct of a general banking business and financing the construction projects—might be viewed as a waiver of the statutory privilege. We prefer to base our decision on another ground. ■ In our view section 94, properly construed, places the venue of actions against a

national bank in any county where it has a branch for the conduct of its general banking business.

*Leonardi* v. *Chase Nat. Bank of City of New York, supra,* 81 F.2d 19, is the leading case to the contrary (see fn. 5, *ante*). The federal appellate court there denied that the Chase National Bank was "established" in a federal court district embracing Brooklyn, where the bank had a branch; rather, the court held, the bank was established only in the federal court district which included Manhattan, the principal place of business fixed by the bank's charter. The *Leonardi* opinion relied primarily on two precedents: *Manufacturers' Nat. Bank* v. *Baack* (S.D.N.Y. 1871) 16 Fed.Cas. p. 671, No. 9052, which long antedated branch banking, and *National City Bank* v. *Domenech* (1st Cir. 1934) 71 F.2d 13, which dealt with a national bank's "location" under a tax statute and had no connection with the congressional intent underlying section 94, the venue statute.

The federal Supreme Court has not considered the venue problem in the context of a branch banking situation. A number of other courts have uncritically followed the *Leonardi* doctrine. (See cases cited fns. 1 and 5, *ante*.) That doctrine denies that a national bank is "established" or "located" wherever it establishes a branch office to conduct general banking business. In our view *Leonardi* and its progeny read the statute erroneously, ignore the realities of modern commercial practices and violate congressional intent. ■ State courts are bound by the federal Supreme Court's interpretation of federal statutes, but decisions of lower federal courts are merely persuasive and will not bind the state courts where their reasoning appears erroneous.[6]

Section 94 refers to the geographic area within which a bank is "established" or "located." The *Leonardi* decision construes the statute as though the quoted words refer to a single place, the bank's headquarters as conceived by its charter. Used in reference to a geographic locality, the two words denote no more than physical placement, unclouded by conceptualistic exhalations. The *Leonardi* opinion, we suggest, injects unnecessary

---

[6]*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129]; *Rohr Aircraft Corp.* v. *County of San Diego* (1959) 51 Cal.2d 759, 764 [336 P.2d 521] (revd. without comment on this point, 362 U.S. 628 [4 L.Ed.2d 1002, 80 S.Ct. 1050]); 21 Corpus Juris Secundum, Courts, section 206, page 377; cf. *Monarch Wine Co.* v. *Butte, supra,* 113 Cal.App.2d at page 839. The federal Supreme Court's denials of certiorari to review the *Leonardi* decision and *Buffum* v. *Chase Nat. Bank of City of New York, supra,* do not transform those decisions into binding precedents, because the highest court's denial of certiorari does not determine the merits of the appeal. (*Poster Exchange, Inc.* v. *National Screen Service Corp.* (5th Cir. 1966) 362 F.2d 571, 574.)

ambiguity into a straightforward statute. For the sake of demonstration, one may hypothesize a measure of ambiguity, hence some need for interpretation. At that point statutory history and statutory purpose combine to illumine meaning, producing an interpretation at odds with *Leonardi* and similar decsions.

After the 1836 demise of the Second Bank of the United States, banking by nationally chartered banks was reinstituted by the National Banking Act of 1863, which in turn was replaced by the National Banking Act of 1864. (*Mercantile Nat. Bank* v. *Langdeau, supra,* 371 U.S. at pp. 558-559 [9 L.Ed.2d at pp. 526-527].) The venue provision, now section 94, originated in the 1863-1864 legislation. The venue statute had interstate and intrastate consequences. It protected a national bank from suits in federal or state courts outside the state where it was established or located. Within the state of domicile, it protected the bank from suit in counties where it was not established or located.

The 1863-1864 statutes did not authorize branch banks; both had in view an array of single-office banks. (See *First Nat. Bank* v. *Missouri* (1924) 263 U.S. 640, 656-659 [68 L.Ed. 486, 492-494, 44 S.Ct. 213].) The 1864 act required each bank's certificate of organization to designate the state and county where its operations were to be conducted and declared that "its usual business shall be transacted at an office or banking house located in the place specified in its organization certificate." (13 Stat. 101-102 (1864); Rev. Stat. §§ 5134, 5190 (1875) as amended.) The venue statute, now section 94, permitted the bank to be sued where it was "established" or "located." Its purpose was "to prevent interruptions in [the banks'] business that might result from their books being sent to distant counties in obedience to process from state courts." (*First Nat. Bank of Charlotte, North Carolina* v. *Morgan, supra,* 132 U.S. at p. 145 [33 L.Ed. at p. 284].) In a system of single-office banking each bank's business activities and its headquarters were at the same place. Hence there was no occasion for a venue statute drawn in terms of a legalistic or synthetic domicile, headquarters or "principal" place of business. The statute was designed to cope with a problem of physical location and spoke only in terms of physical location.

The general system of single-office national banks persisted for three-quarters of a century.[7] In many states competitive pressures emanated from

[7]The history of the venue statute in relation to the development of branch banking is narrated in greater detail in Schefflin and Dixon, *An Assault on the Venue Sanctuary of National Banks* (1966) 34 Geo.Wash.L.Rev. 765. The thesis we pursue here was suggested by that article. See also, *Helco, Inc.* v. *First National City Bank, supra,* 333 F.Supp. at pages 1292-1293.

branch banking by state banks. (See *Bank of Italy* v. *Johnson* (1926) 200 Cal. 1, 13-14 [251 P. 784]; Schefflin and Dixon, *op. cit.*, fn. 7.) In 1927 Congress passed the McFadden Act, permittng national banks to establish branches at their charter locations. A 1933 statute expanded the authority, permitting the Comptroller of the Currency to allow extensions of branch banking by national banks consistent with state policy vis-à-vis state banks. (See 12 U.S.C. §§ 36, 81.) The venue statute stood unchanged.

Only after the advent of branch banking was there occasion to distinguish between the multiple physical locations of a banking enterprise and the unitary, synthetic concept of domicile, headquarters or "principal" place of business. The statutes, nevertheless, continued to speak in terms of physical location. Before the 1927 amendments the National Banking Act had declared: "The usual business of each national banking association shall be transacted at an office or banking-house located in the place specified in its organization certificate." (Rev. Stat. § 5190, as added by 13 Stat. 101 (1864).) The McFadden Act amended this declaration to read: "The general business of each national banking association shall be transacted in the place specified in its organization certificate and in the branch or branches, if any, established or maintained by it. . . ." (Rev. Stat. § 5190, as amended by 44 Stat. 1229 (1927); 12 U.S.C. § 81.)

The McFadden Act, moreover, declared: "No branch of any national banking assocation shall be established or moved from one location to another without first obtaining the consent and approval of the Comptroller of the Currency." (Rev. Stat. § 5155(e), as added by 44 Stat. 1228 (1927); 12 U.S.C. § 36(e).)

A truism of the law admonishes courts to construe statutes in the light of associated legislation. Any uncertainty beclouding the venue statute before 1927 should have been eliminated by that year's legislation. Viewed in relation to the former single-office system of banking, the venue statute's concern had been the physical location of the banking business, not the synthetic charter designation. The 1927 legislation now spoke in terms of banks which would be "established" at the "locations" of their authorized branches. The venue statute suffered no change, express or implied. With reference to a multibranch bank, it continued its concern with the physical placement of each bank's "general business," that is, the locations of its main banking office and its branch banking offices.[8]

---

[8]The phrase "general business" is extracted from Revised Statutes section 5190, 12 United States Code section 81, *supra.*

Statutory purpose leads to the same interpretation as statutory language. Section 94 recognizes one of the hard realities of adversary litigation—that litigants sometimes use venue tactics as a club. As we have observed, the federal Supreme Court discerned a statutory purpose to prevent disruptions of bank business caused by sending records to distant lawsuits. (*First Nat. Bank of Charlotte, North Carolina* v. *Morgan, supra,* 132 U.S. at p. 145.) Described in more general terms, the purpose was to prevent harassment by distant lawsuits. Copy machines and computerization now permit inexpensive, rapid duplication of documents and data. Banks can transport witnesses, documents and lawyers as easily as any litigant and more easily than some.

A 1971 report of the California Superintendent of Banks reveals that four leading national banks had 994, 422, 285 and 283 branches, respectively, in California's 58 counties.[9] Another source shows that these same four banks had 37, 5, 16 and 19 branches, respectively, in Sacramento County alone.[10] The same sources reveal that petitioner Central Bank had 34 branches in California in 1971, including the Sacramento branch. When a bank spreads its general banking business throughout the state, the possibilities of harassment dwindle and disappear. Occasionally, as here, one branch may reach across internally prescribed boundaries and transact business in another branch's locality. Most lawsuits grow out of local business conducted by a local branch. When local business gets a bank into a lawsuit in a county where it has one or more branches, the bank's insistence on moving venue to its home office subverts the federal statute into a tactical weapon.[11]

There is nothing in section 94 or the accompanying legislation which places venue in one place to the exclusion of all others. The *Leonardi* case and its progeny (fns. 1 and 5, *ante*) fail to recognize that location of the

[9]Superintendent of Banks, State of California, Sixty-second Annual Report (1971) page 44.

[10]Federal Deposit Insurance Corp., Operating Banking Offices, January 1, 1972.

[11]A national bank's vulnerability to suit where it establishes a branch bank will not expose it to "nuisance" actions outside the state of its domicile because, generally speaking, the National Banking Act restricts branch banking to the state where the bank has its headquarters. (See 12 U.S.C. § 36(c); *Frankford Supply Co.* v. *Matteo, supra,* 305 F.Supp. at p. 796, fn. 4.) Nor will it place branch banking concerns in a position inferior to other litigants. When sued at a branch bank location which is alien to the transaction, a bank may invoke general statutes for changing venue to a more appropriate place. Under California law a corporation, including a bank, has a right to be sued in a county where the contract is made or to be performed or where the *liability* arises or the breach occurs; if it is sued elsewhere, it may obtain a change of venue to its principal place of business. (Code Civ. Proc., § 395.5; *Sea World, Inc.* v. *Superior Court* (1970) 13 Cal.App.3d 100, 104 [91 Cal.Rptr. 336]; 2 Witkin, Cal. Procedure (2d ed. 1971) p. 1299.)

banking business, not location of headquarters, is the venue statute's prime concern; fail to appraise the statute in the light of the associated legislation enacted in 1927; turn, instead, to the dim light of an 1871 decision handed down in the era and formulated in the context of single-office banking. They frustrate congressional intent to allow national banks to be sued where they establish their banking business.[12]　　█ We construe section 94 to mean that a national bank is "located" and may be sued in a county where it has a branch bank. In the case of petitioner Central Bank, Sacramento is such a county.

The petitions for mandate are denied.

Regan, J., and Janes, J., concurred.

Petitioners' application for a hearing by the Supreme Court was denied April 25, 1973.

---

[12]Several courts have suggested that the Congress has displayed its satisfaction with the *Leonardi* rule by failing to amend section 94; or that any change must emanate from the Congress. (*United States National Bank* v. *Hill, supra,* 434 F.2d at p. 1021; *General Electric Credit Corp.* v. *James Talcott, Inc., supra,* 271 F.Supp. at p. 703.) "It is ironic that an unsound interpretation of a statute should gain strength merely because it has stood unnoticed by the legislature. It is a mighty assumption that legislative silence means applause. It is much more likely to mean ignorance or indifference." (Traynor, *Symposium on Law Reform, The Courts: Interweavers in the Reformation of Law* (Can. 1967) 32 Sask.L.Rev. 201, 211; see *Boys Market* v. *Clerks Union* (1970) 398 U.S. 235, 241-242 [26 L.Ed.2d 199, 204-205, 90 S.Ct. 1583]; *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1127-1128 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].)