[Civ. No. 16926. Third Dist. Oct. 16, 1979.]

LORNA MULLANEY et al., Plaintiffs and Appellants, v.
MARION J. WOODS, as Director, etc., Defendant and Respondent.

COUNSEL

Roberta Ranstrom and Kathleen Walsh for Plaintiffs and Appellants.

Evelle J. Younger and George Deukmejian, Attorney Generals, John J. Klee, Jr., Assistant Attorney General, Thomas E. Warriner, Charlton G. Holland and Janet G. Sherwood, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**PARAS, J.**—Plaintiffs Lorna Mullaney and her children Peter and Heather Mullaney appeal from a judgment of the Sacramento County Superior Court denying their petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5). They sought to compel defendant Director of the California Department of Benefit Payments (Director) to set aside his decision finding them ineligible for aid to families with dependent children (AFDC) due to their failure to supply the department with social security numbers for the children as required by federal and state AFDC regulations. (45 C.F.R. § 232.10; E.A.S. (eligibility and assistance standards) § 40-105.2.) All three plaintiffs claim the regulations requiring that numbers be furnished on the children's behalf are invalid because (1) they erroneously interpret the federal statute they were designed to implement (42 U.S.C.A. § 601 et seq.) and (2) they violate the federal Privacy Act of 1974 (5 U.S.C.A. § 552a). Lorna, who professes certain religious beliefs which prevent her from obtaining social security numbers for the children, additionally claims the denial of benefits unconstitutionally infringes upon her First Amendment right to freedom of religion (U.S. Const., Amend. I; Cal. Const., art. I, § 4), her "family freedoms," and her right to privacy (Cal. Const., art. I, § 1). Peter and Heather also contend denial of benefits to them on account of their mother's refusal to procure social security numbers for them abridges their right to equal protection of the laws. (U.S. Const., Amend. XIV.)

The Director contends initially that the purported federal questions are not properly before this court. In addition, he disputes all plaintiffs' contentions on the merits.

On January 3, 1977, Lorna reapplied[1] for AFDC benefits on behalf of herself and Heather and Peter, then four and six years old respectively. The application was denied because social security numbers are required by applicable state and federal regulations, they were not supplied for the children, and Lorna refused to apply for them in the children's behalf. Due to Lorna's unemployed status and to the absence of their father, the children are admittedly "needy" and "dependent" within the meaning of 42 United States Code Annotated section 606, the federal AFDC legislation. (See also, Welf. & Inst. Code, § 11250.)

Lorna belongs to no organized church or church group, but she has developed her own understanding of the Bible. She believes social security numbers are the "mark . . . of the beast" referred to in the New Testament's Book of Revelation, hence their acquisition will preclude the children's access to heaven. (See, Revelation 13:17.) This is the reason for her refusal to obtain numbers for them.

Plaintiffs requested and were given a "fair hearing" on January 26, 1977, before a referee from the department. (Welf. & Inst. Code, § 10950.) The hearing officer's proposed decision sustained the denial of benefits for lack of the social security numbers.[2] The proposed decision was adopted by the Director.

Plaintiffs then sought a writ of administrative mandamus (Code Civ. Proc., § 1094.5; Welf. & Inst. Code, § 10962) in the superior court, alleging that defendant had "proceeded in absence or excess of jurisdiction and abused its [sic] discretion by failing to follow the law." The Director demurred to the petition on the basis that plaintiffs had failed to join the United States Department of Health, Education, and Welfare (HEW), the federal agency responsible for administering and enforcing the challenged federal (45 C.F.R. § 232.10) and state (E.A.S. § 40-105.2) regulations.[3] The Director then filed an answer. The trial court entered the judgment denying the petition.

---

[1] Plaintiffs had apparently been receiving AFDC benefits until November 30, 1976, at which time Lorna left the children with her mother. For a short while they received AFDC benefits as part of the grandmother's household.

The record is unclear as to the length of time plaintiffs had managed to obtain AFDC benefits without the social security numbers. Inferably the practice had gone on since the elder child's birth. Since there is no attempt to claim a present right to benefits arising out of the past grants, we need not inquire into this circumstance.

[2] The ineligibility of the children rendered Lorna similarly ineligible. (See 42 U.S.C.A. § 606(b).)

[3] The same contention is made again on appeal. In view of our holding on the merits, we need not address it.

I

■ Plaintiffs contend initially that 45 Code of Federal Regulations, section 232.10[4] (and E.A.S. § 40-105.2) is invalid because inconsistent with the federal AFDC statutory scheme (42 U.S.C.A. § 601 et seq.).[5]

■ It is well settled that " 'the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . .' " (*New York Dept. of Social Services* v. *Dublino* (1973) 413 U.S. 405, 421 [37 L.Ed.2d 688, 699, 93 S.Ct. 2507]; *Columbia Broadcasting* v. *Democratic Comm.* (1973) 412 U.S. 94, 121 [36

---

[4]45 Code of Federal Regulations, section 232.10, provides in pertinent part: "The State plan must provide that:

"(a) As a condition of eligibility, each applicant for or recipient of aid will be required:

"(1) To furnish to the State or local agency a social security account number, hereinafter referred to as the SSN (or numbers, if more than one has been issued); and

"(2) If he cannot furnish a SSN (either because such SSN has not been issued or is not known), to apply for such number through procedures adopted by the State or local agency with the Social Security Administration. . . .

". . . . . . . . . . . . . . . . .

"(e) The State or local agency will use such account numbers, in addition to any other means of identification it may determine to employ, in the administration of the plan.

"(f) 'Applicant' and 'recipient' include the caretaker relative, the children, and any other individual whose needs are considered in determining the amount of assistance.

"(g) The State or local agency shall notify the applicant or recipient that the furnishing of the SSN is a condition of eligibility for assistance required by section 402(a)(25) of the Social Security Act and that the SSN will be utilized in the administration of the AFDC program."

Eligibility and Assistance Standards, section 40-105.2, the California counterpart of 45 Code of Federal Regulations, section 232.10, provides in pertinent part as follows:

"40-105.2 *Social Security Account Number (SSN)*

".21 Each applicant or recipient member of the FBU [family budget unit], excluding unborn children shall, as a condition of eligibility:

".211 Furnish a Social Security Account Number (SSN) or numbers, if more than one, or

".212 If he/she cannot furnish a SSN, cooperate in securing such number by applying directly to a local office of the Social Security Administration. The applicant or recipient shall furnish the SSN to the county welfare department when it has been received.

". . . . . . . . . . . . . . . . .

".23 Where the parent or relative living with a child refuses to furnish or apply for a number for that child, such child is not eligible.

". . . . . . . . . . . . . . . . .

".25 The county welfare department shall apply the requirement of this section to all applicants effective October 1, 1975, and to all recipients no later than the next redetermination of eligibility."

[5]42 United States Code Annotated section 602(a)(25) reads: "A State plan for aid and services to needy families with children must . . . provide (A) that, as a condition of eligibility under the plan, each applicant for or recipient of aid shall furnish to the State agency his social security account number (or numbers, if he has more than one such number), and (B) that such State agency shall utilize such account numbers, in addition to any other means of identification it may determine to employ in the administration of such plan;"

L.Ed.2d 771 794, 93 S.Ct. 2080].) Absent such "compelling indications," HEW's interpretation of 42 United States Code Annotated section 602(a)(25) therefore should stand.

 It is thus to the statutory phrase "applicant for or recipient of aid" of section 602(a)(25) that our attention must be directed. Plaintiffs contend that this phrase was intended to describe only the adult caretaker relative who physically files the application and receives the government's checks for the children's monetary entitlement.[6] In support of this argument they point out that the term "applicant or recipient" appears in 42 United States Code Annotated section 602(a)(26)[7] in a context which suggests it refers only to an adult member of an AFDC household; since the two provisions were enacted at the same time, plaintiffs urge, Congress must have used the terms "applicant" and "recipient" in the same sense in both. As support for this contention they cite a federal district court case which so held and thus invalidated, in that jurisdiction, the social security number requirement herein at issue. (*Green* v. *Philbrook* (D.Vt. 1977) 427 F.Supp. 834.)

---

[6]The AFDC welfare program is a system designed "For the purpose of encouraging the care of dependent children in their own homes . . . by enabling each State to furnish financial assistance . . . to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection, . . ." (42 U.S.C.A. § 601.) Thus a household's eligibility for AFDC is predicated upon the presence therein of a needy, dependent child; a childless household cannot qualify for AFDC benefits. (See, 42 U.S.C.A. § 606(b).) Certain adult members of the AFDC household, however, are indirectly aided in that their needs enter into the welfare agency's calculation of the level of financial assistance. (See e.g., 42 U.S.C.A. §§ 601, 602(a)(7).)

[7]42 United States Code Annotated section 602(a)(26) provides: "A State plan for aid and services to needy families with children must . . . provide that, as a condition of eligibility for aid, each *applicant or recipient* will be required—

"(A) to assign the State any rights to support from any other person such applicant may have (i) in his own behalf or in behalf of any other family member for whom the applicant is applying for or receiving aid, and (ii) which have accrued at the time such assignment is executed,

"(B) to cooperate with the State (i) in establishing the paternity of a child born out of wedlock with respect to whom aid is claimed, and (ii) in obtaining support payments for such applicant and for a child with respect to whom such aid is claimed, or in obtaining any other payments or property due such applicant or such child, unless (in either case) such applicant or recipient is found to have good cause for refusing to cooperate as determined by the State agency in accordance with standards prescribed by the Secretary, which standards shall take into consideration the best interests of the child on whose behalf aid is claimed; and that, if the relative with whom a child is living is found to be ineligible because of a failure to comply with the requirements of subparagraphs (A) and (B) of this paragraph, any aid for which such child is eligible will be provided in the form of protective payments as described in section 406(b)(2) (without regard to subparagraphs (A) through (E) of such section); . . ." (Italics added.)

■ Although as a state court we are bound by the federal Supreme Court's interpretation of a federal statute, "decisions of lower federal courts are merely persuasive and will not bind the state courts where their reasoning appears erroneous." (Fn. omitted; *Central Bank* v. *Superior Court* (1973) 30 Cal.App.3d 962, 967 [106 Cal.Rptr. 912]; *Debtor Reorganizers, Inc.* v. *State Bd. of Equalization* (1976) 58 Cal.App.3d 691, 696 [130 Cal.Rptr. 64]; *People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].) We do not find the *Green* v. *Philbrook* opinion persuasive and decline to follow it.[8]

■ Inasmuch as the avowed primary purpose of the AFDC program is to aid the needy and dependent child whose presence is the basis of a household's eligibility for AFDC (42 U.S.C.A. § 601), necessarily such a child is a "recipient of aid" within the meaning of 42 United States Code Annotated section 602(a)(25). This is almost axiomatic; but even if not, it is unquestionably a reasonable construction of the statute. In its challenged regulation, HEW has interpreted the phrase "applicant for or recipient of aid" in 42 United States Code Annotated section 602(a)(25) to include the AFDC child as well as his caretaker relative. (45 C.F.R. § 232.10.) This interpretation is in no way at odds with the AFDC statutory scheme or with the specific statute's purpose. Accordingly 45 Code of Federal Regulations, section 232.10 is not invalid as an erroneous interpretation of the federal statute it was designed to implement.

II

■ Plaintiffs next assert that 45 Code of Federal Regulations, section 232.10; violates the Privacy Act of 1974 (5 U.S.C.A. § 552a) and consequently must be held invalid. Since the Privacy Act was expressly made inapplicable to "any disclosure [of social security number or numbers] required by Federal statute,"[9] this contention patently has no merit.

---

[8]For the same reason we decline to follow *Stevens* v. *Berger* (E.D.N.Y. 1977) 428 F.Supp. 896.

[9]The Privacy Act of 1974 was enacted by Public Law No. 93-579 (Sen.No. 3418, 93d Cong. (1974); 5 U.S.C.A. § 552a.) Section 7 of Public Law No. 93-579 provides: "Sec. 7. (a)(1) It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.

"(2) the provisions of paragraph (1) of this subsection shall not apply with respect to—

"(A) any disclosure which is required by Federal statute, . . . ."

## III

■ Peter and Heather additionally charge that denial of AFDC benefits to them violates their constitutionally guaranteed rights to equal protection of the laws. (U.S. Const., Amend., XIV, § 1.) Their claim has its foundation in the fact that the federal AFDC statutes authorize the making of protective payments of aid to children in certain cases in which the adult caretaker relative, by failure to meet certain preconditions to eligibility, has rendered *himself* ineligible for AFDC benefits;[10] failure therefore to make protective payments to the children, it is urged, denies them equal protection.

■ The equal protection guarantee embodied in the Fourteenth Amendment requires equal treatment of persons similarly situated. (See, *Caskey Baking Co.* v. *Virginia* (1941) 313 U.S. 117, 121 [85 L.Ed. 1223, 1227, 61 S.Ct. 881].) Conversely, " 'the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways.' " (*Eisenstadt* v. *Baird* (1972) 405 U.S. 438, 446-447 [31 L.Ed.2d 349, 358, 92 S.Ct. 1029].) ■ By the terms of the applicable statute, protective payments to children *eligible for AFDC* are authorized when the adult caretaker relative has made himself ineligible. But a child who does not furnish or apply for a social security number at the time of the AFDC application, never becomes eligible at all, hence is not within the class of persons for whom protective payments are authorized. (Cf., 42 U.S.C.A. § 602(a)(25)(A).)[11] The bootstrap nature of the equal protection argument is quite apparent; Peter and Heather begin it by insinuating themselves into a class of which they are not members. In proper fact they are not similarly situated with children in whose behalf protective payments are authorized. The equal protection claim must fail.

---

[10] 42 United States Code Annotated section 602(a)(19)(F)(i) provides that if, in certain circumstances therein set forth, the adult caretaker relative refuses to participate in a work-incentive program, his or her needs will not be considered in determining the amount to which the AFDC household is entitled; aid for the children will be paid in the form of protective payments. 42 United States Code section 602(a)(26)(B) similarly provides that if the adult caretaker relative fails to cooperate in establishing the paternity of the AFDC child, or in assigning to the state or obtaining support payments for himself or herself or for the child, the adult shall be ineligible for AFDC benefits; but the children may receive aid in the form of protective payments.

[11] "A State plan for aid and services to needy families with children must . . . provide . . . that, *as a condition of eligibility* under the plan, *each applicant* for *or recipient* of aid *shall furnish* to the State agency *his social security* account *number* . . . ." (Italics added; 42 U.S.C.A. § 602(a)(25)(A).)

## IV

■ ■■■■ , ■ Thus we reach and address the claim of Lorna that the denial of AFDC benefits as to her is a violation of the free exercise clause of the First Amendment of the United States Constitution (and Cal. Const., art. I, § 4) as made applicable to the states through the Fourteenth Amendment.[12]

### A

■ The free exercise clause of the First Amendment guarantees that "Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. . . .[T]he Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." (Fn. omitted; *Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1218, 60 S.Ct. 900, 128 A.L.R. 1352].)

The perimeters within which a particular belief or practice will be deemed "religious" and thus accorded the protections of the First Amendment free exercise clause are not readily discernible. The closest the United States Supreme Court has come to articulating some boundaries for the concept of "religion" has been in the specialized

[12]Ancillary to her First Amendment claim, Lorna also charges the state's action unlawfully intrudes on her "family freedoms" and "right to privacy." The "family freedoms" argument is subsumed in the free exercise claim; thus our discussion of the First Amendment issue applies as well to it.

The "right to privacy" claims are twofold. First Lorna alleges a violation of the federal Privacy Act of 1974 because the Director has purportedly failed to disclose to her the use to which her social security number will be put. (Privacy Act of 1974, Pub.L. No. 93-579 § 7(b): 5 U.S.C.A. § 552a.) This contention was never advanced in the trial court. Thus, beyond noting that its relevancy to the questions involved herein is not apparent, we decline to consider it.

The second "right to privacy" claim, as can best be determined from the brief on appeal, is that the social security number requirement somehow violates Lorna's right to privacy guaranteed her by our state Constitution. (Cal. Const., art. I, § 1.) The California Supreme Court has held that the constitutional provision was aimed at the "mischiefs" of "(1) 'government snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records." (*White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222].) Plaintiffs have made no showing that any such "mischiefs" are involved in this case; thus we reject the right-to-privacy claim.

context of construing a federal statute which granted military draft exemption to persons who, by reason of their religious training and belief, were conscientiously opposed to war in any form.[13] In *United States* v. *Seeger, supra,* 380 U.S. 163 [13 L.Ed.2d 733] the court articulated that "A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition." (380 U.S. at p. 176 [13 L.Ed.2d at p. 743].)[14]

Speaking seven years later in a case directly concerning the First Amendment's free exercise clause, the court noted in *Wisconsin* v. *Yoder* (1972) 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526] that: "[T]o have the protection of the Religion Clauses, the [free exercise] claims must be rooted in religious belief. Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." (Fn. omitted; *Wisconsin* v. *Yoder, supra,* 406 U.S. at pp. 215-216 [32 L.Ed.2d at p. 25].) It is evident from the text of the court's opinion in that case that an elaborate record was presented which "abundantly support[ed] the claim that the [religious practice therein at stake was] not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." (406 U.S. at p. 216 [32 L.Ed.2d at p. 25].)

By contrast, the record with which we have been supplied here does not begin to approach this laudable standard. Plaintiffs have not provided us with a record of the administrative hearing. Hence Lorna's own oft-repeated characterization of her views as a "strong" or "sincere religious belief" is virtually the only material we have that bears on the

---

[13] *United States* v. *Seeger* (1965) 380 U.S. 163 [13 L.Ed.2d 733, 85 S.Ct. 850], construed then 50 United States Code Appendix section 456(j). That provision defined the term "religious training and belief," as used in the statute, as " 'an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but [not including] essentially political, sociological, or philosophical views or a merely personal moral code.' " (380 U.S. at p. 165 [13 L.Ed.2d at p. 736].)

[14] At least one commentator has suggested that although *Seeger* was a matter of statutory construction only, the definition therein articulated "seems to suggest the Court's ultimate definition of religion for constitutional purposes." (Giannella, *Religious Liberty, Nonestablishment, and Doctrinal Development* (1967) 80 Harv.L.Rev. 1381, 1425.)

threshold question of whether we are in fact dealing with a belief of the stature that the free exercise clause was designed to protect.[15]

However, in her verified petition in the trial court, Lorna alleged her refusal to apply for social security numbers was "based on a strong religious belief that social security numbers are the 'mark of the beast' referred to in Revelations 14 and 15 and would prevent her children from going to heaven." The Director's answer admitted the truth of this allegation. The pleadings thus appear to foreclose further inquiry into whether plaintiff's belief is in fact one for whose protection the free exercise clause was added to our federal Constitution. ■■ ■■■■ Because of this concession, for purposes of our remaining discussion, we shall assume that we are indeed dealing with such a belief.[16]

[15]Beyond the hearing officer's note that "the claimant presented a very sincere argument," we have no express findings, and nothing else from which to imply findings, to aid us on this subject.

[16]We do this reluctantly. It is worth noting that those free exercise cases in which the state's interest has been forced to yield to an individual's religious claim have differed from this case in two highly significant respects; they have (1) concerned a cardinal principle of (2) an "orthodox" or "organized" religion whose genuineness was unquestioned. (See e.g., *Wisconsin* v. *Yoder, supra,* 406 U.S. at p. 219 [32 L.Ed.2d at p. 27]: ". . . almost 300 years of consistent practice, and strong evidence of a sustained faith pervading and regulating respondents' entire mode of life support the claim that enforcement of the State's requirement of compulsory formal education after the eighth grade would gravely endanger if not destroy the free exercise of respondents' religious beliefs;" *Sherbert* v. *Verner* (1963) 374 U.S. 398, 399, fn. 1 [10 L.Ed.2d 965, 968, 83 S.Ct. 1790]: "Nor is there any doubt that the prohibition against Saturday labor is a basic tenet of the Seventh-day Adventist creed, . . .;" *Cantwell* v. *Connecticut* (1940) 310 U.S. 296 [84 L.Ed. 1213, 60 S.Ct. 900, 128 A.L.R. 1352]: Jehovah's Witnesses' creed required proselytizing as religious exercise; *People* v. *Woody* (1964) 61 Cal.2d 716 [40 Cal.Rptr. 69, 394 P.2d 813]: sacramental use of peyote was a *sine qua non* of ancient Indian religion.)

Of course the history behind and the very sense of the First Amendment's religion clauses require that their protection not be confined merely to "organized" religions, for to impose such a limitation would create the very evil the religious freedom guarantees were enacted to avert. The state, by decreeing which particular creeds are entitled to protection against governmental intrusion, would in a very real sense be establishing state-sanctioned religions. However, as the *Yoder* Court noted (p. 722, *ante*), "the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests," by the simple expedient of purporting to cloak his particular beliefs in "religious" garb. Thus a certain amount of concededly delicate inquiry into the nature of the belief is proper, in order to avoid compromising the integrity of the free exercise clause by extending its protection to matters not legitimately within its scope. (See, Giannella, *supra,* 80 Harv.L.Rev. at pp. 1417-1418.)

Surely there is a qualitative difference between impinging upon practices which are virtual forms of holy worship for believers (as in *Sherbert, Cantwell,* and *Woody*) or integral parts of and inseparable from a religious way of life (as in *Yoder*) on the one hand and on the other hand requiring a person who adheres to no general religious beliefs or practices but reads the Bible in such a manner as to make social security numbers marks of damnation to procure such numbers for her children or else forego the

B

██ In support of her claim that denial of AFDC benefits works an unconstitutional burden on the free exercise of her religion, Lorna relies on *Sherbert* v. *Verner, supra,* 374 U.S. 398 [10 L.Ed.2d 965]. There a state denied unemployment benefits to a sabbatarian whose religious beliefs precluded her from working on Saturdays; her refusal to accept Saturday work caused the state to find her ineligible for benefits as one who had, in the terms of the state statute, failed without good cause to accept suitable work when offered. (*Sherbert* v. *Verner, supra,* 374 U.S. at pp. 399-401 [10 L.Ed.2d at pp. 967-969].) The court rejected the state's claim that its action did not infringe upon any constitutional liberties because it did not " 'in any way prevent [the claimant] in the exercise of her right and freedom to observe her religious beliefs in accordance with the dictates of her conscience' " (374 U.S. at p. 401 [10 L.Ed.2d at p. 969]), stating: "The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship. [¶] . . . [T]o condition the availability of benefits upon this appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." (374 U.S. at pp. 404-406 [10 L.Ed.2d at pp. 970-971].)

Having thus found that the claimant's disqualification for receipt of unemployment benefits represented an infringement on her free exercise rights, the court next looked to see whether the statutory eligibility provision, as applied in her case, promoted a compelling state interest which could not be promoted in another, less restrictive way. (*Sherbert* v. *Verner, supra,* 374 U.S. at pp. 406-407 [10 L.Ed.2d at p. 972].) The state advanced the "possibility that the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work might not only dilute the unemployment compensation fund but also hinder the scheduling by employers of necessary Saturday work." (*Ibid.*) Finding

government benefits she seeks. (See, Giannella, *supra,* 80 Harv.L.Rev. at pp. 1419-1421.) Manifestly, forms of worship and integral elements of religious ways of life are within the pale of the First Amendment's religious freedom clause. It is far less certain, however, that the latter self-proclaimed religious belief fits the same mold. The fact that basic tenets of organized religions tend to weigh more heavily in the free exercise scale may simply be a manifestation of the principle that a "belief" does not become a "religion" for free exercise clause purposes simply by self-proclamation.

that the state had not made an adequate record either to show the "compelling" nature of its interest in preventing fraud[17] or to demonstrate that no alternative form of regulation could serve that interest without infringing free exercise freedoms, the court overturned the state's action as an impermissible infringement on free exercise rights.

Under the rationale of the *Sherbert* case, defendant's denial of AFDC benefits to plaintiffs does constitute an infringement on Lorna's free exercise freedoms, for she is in a sense forced to pay a price (the loss of AFDC benefits) for acting pursuant to her religious belief that social security numbers will doom her children to purgatory or worse. Thus we must examine the nature of the state's interests in requiring social security numbers, and ascertain whether those interests are sufficient to counterbalance this infringement on First Amendment freedoms.

The federal regulation at issue was promulgated by the federal government to aid in the administration of the AFDC program, by providing a positive means of identification for welfare applicants and recipients and a mechanism by which to detect welfare fraud and locate missing parents. The Director urges that the state regulation furthers yet one more state interest, that of promulgating and enforcing its version of the federal regulation; the state program thereby meets federal standards and thus averts the possibility of losing part or all of its federal funding for failure so to conform.

"To strike down, without the most critical scrutiny, legislation which imposes only an indirect burden on the exercise of religion, i.e., legislation which does not make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature . . . . [¶] [W]e are a cosmopolitan nation made up of people of almost every conceivable religious preference. . . . Consequently, it cannot be expected, much less required, that legislators enact no law regulating conduct that may in some way result in an economic disadvantage to some religious sects and not to others because of the special practices of the various religions. . . . [¶] . . . If the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect. But if the State regulates conduct by enacting a general law within its power, the purpose and effect of which is to advance the State's secular goals, the

---

[17]I.e., the court found no support in the record for the asserted "fears of malingering or deceit." (374 U.S. at p. 407 [10 L.Ed.2d at p. 972].)

statute is valid despite its indirect burden on religious observance unless the State may accomplish its purpose by means which do not impose such a burden." (*Braunfeld* v. *Brown* (1961) 366 U.S. 599, 606-607 [6 L.Ed.2d 563, 568, 81 S.Ct. 1144].)

 It is no secret that welfare fraud consumes huge amounts of public funds annually. Nor is it any secret that missing parents (persons who, although legally responsible for and financially capable of supporting their children, absent themselves from the home and thus force their families into the welfare rolls) swell the ranks of welfare recipients still more. These facts are well documented in the legislative histories underlying the enactment of 42 United States Code Annotated section 602(a), subsections (25) and (26),[18] and other recent amendments to the Social Security Act.[19] Those histories further indicate that skyrocketing

[18]"The problem of welfare in the United States is, to a considerable extent, a problem of the non-support of children by their absent parents. Of the 11 million recipients who are now receiving Aid to Families With Dependent Children (AFDC), 4 out of every 5 are on the rolls because they have been deprived of the support of a parent who has absented himself from the home.

"The Committee believes that all children have the right to receive support from their fathers. The Committee bill, like the identical provision passed by the Senate (H.R. 3153) last year, is designed to help children attain this right, including the right to have their fathers identified so that support can be obtained. The immediate result will be a lower welfare cost to the taxpayer but, more importantly, as an effective support collection system is established fathers will be deterred from deserting their families to welfare and children will be spared the effects of family breakup.

" . . . . . . . . . . . . . . .

"*Absent fathers.*—It is in those families in which the father is 'absent from the home' that the most substantial growth has occurred. As a percentage of the total caseload, AFDC families in which the father was absent from the home increased from 66.7 percent in 1961 to 74.2 percent in 1967, 75.4 percent in 1969, 76.2 percent in 1971, and 80.2 percent in 1973.

"In terms of numbers of recipients rather than percentages, 2.4 million persons were receiving AFDC in 1961 because the father was absent from the home. By 1967, that figure had grown to 3.9 million and by 1969 to 5.5 million. By the beginning of 1971, 7.5 million persons were receiving AFDC because of the father's absence from the home, and by the end of June 1974 that figure had grown to almost 8.7 million. Thus, in the past 6½ years, families with absent fathers have contributed about 4.8 million additional recipients to the AFDC rolls. . . ." (Sen. Rep. No. 93-1356, 2d Sess., 1974 U.S. Code Cong. & Admin. News, No. 4, at pp. 8145-8146.)

[19]The following remarks appear in the legislative history which accompanied Public Law No. 92-603, the federal measure which federalized Old Age, Survivors, and Disability Insurance programs and which proposed the federalization of AFDC:

"THE NEED FOR WELFARE REFORM

"Your committee's proposals for welfare reform have been formulated during a period of mounting Congressional concern, both over the extraordinary growth in the welfare rolls, particularly in the aid to families with dependent children (AFDC) program, and in the nature of that growth. . . .

"The exploding number of broken families which are becoming increasingly dependent on welfare for all their needs poses serious social problems. And, as the costs of

welfare costs in turn impose financial hardship on all levels of government, beyond merely the welfare regime itself. The need to control such costs is a vital one.

The use of a number to identify each recipient of aid was intended to facilitate the administration of these vast, constantly growing, welfare programs. The social security number of an applicant or recipient of working age is of obvious utility in cross-checking against federal withholding records to determine whether a claimant has received or is receiving income which he or she has failed to report. Likewise, the social security number of a child is useful in cross-checking to determine whether that child is receiving benefits under some other welfare program (e.g., old-age or disability insurance benefits under 42 U.S.C.A. § 402(d)), which must be taken into account in determining the level of assistance to which his family is entitled on his behalf. And the assignment of a number to a child prevents the making of multiple claims for the same child.

We are persuaded that the state's interest in maintaining the fiscal integrity of the very system of whose financial resources plaintiffs seek to partake is sufficiently compelling to counterbalance the incidental infringement thereby placed on Lorna's free exercise of religion.

With respect to the second prong of the *Sherbert* and *Braunfeld* test, we are similarly persuaded that there is no less restrictive means by which this compelling governmental interest can be promoted. We find this particularly so as to this or any other state, because federal regulations *require* implementation of the social security number requirement on pain of losing the very federal funds which enable the state to support the needy persons within its boundaries. Thus the state has no choice but to follow the federal dictate. Even as to the federal government, it is difficult to imagine an administrative tool so serviceable as the federally promul-

---

supporting them soar, all levels of government have been confronted with difficult fiscal problems. . . .

". . . In short, every possible step will be taken under the new programs to assure that only those eligible for the benefits will get them. Your committee is convinced, both on the basis of specific studies and on the testimony of witnesses before the committee, that there are many thousands of people now on the AFDC rolls who do not belong there. There is evidence that there are people on welfare who do not report their earnings. There is evidence that some fathers have only seemed to have separated from their families, while actually remaining a part of the family, and providing support to the family which the welfare office never learns about. Under the provisions of the bill, your committee expects that such practices would be eliminated. . . ." (H. R. Rep. No. 92-231, 92d Cong. 2d Sess., 1972 U.S. Code Cong. & Admin. News, No. 3, at pp. 4990, 5148.)

gated social security number. No one can dispute that some sort of specially adapted system is required to administer successfully a panoply of welfare programs whose recipients number in the millions. The chief value of a system lies in its ability to apply uniformly to all within its scope, without exception. Absent a graver intrusion on First Amendment freedoms than that presented by Lorna here, we are unwilling to judicially carve out such an exception.

The judgment (order denying petition for writ of mandamus) is affirmed.

Puglia, P. J., concurred.

**REYNOSO, J.**—I dissent. Aside from other concerns[1] I cite two grounds. First, the majority incorrectly interprets the phrase "applicant for or recipient of aid" (42 U.S.C. § 602(a)(25)) to include dependent children. I conclude that Congress meant the terms "applicant" and "recipient" to apply only to the caretaker relatives who apply for or receive benefits on behalf of dependent children. The terms may not be interpreted to include the children receiving benefits from AFDC programs. Second, petitioner's religious belief which prohibits her from obtaining social security numbers for her children prevails over the state's requirement that such numbers be furnished as a condition to the receipt of assistance.

I

As noted by the majority, the determination of whether the federal (45 C.F.R. § 232.10) and state (E.A.S. § 40-105.2) regulations which require social security numbers for the children are inconsistent with the grant of authority contained in 42 United States Code section 602(a)(25) depends upon the construction of the words "applicant for or recipient of aid" as used in the statute. A federal district court case has held that dependent children are not "applicant[s] for or recipient[s] of aid" as those terms are used in section 602(a)(25). (*Green* v. *Philbrook,* 427 F.Supp. 834.) I find the federal district court's interpretation of the federal statute logical and reasonable.

The same subsection of the Social Services Amendment Act of 1974 which added United States Code section 602(a)(25) also added section

---

[1] I am unpersuaded by the privacy and equal protection conclusions of the majority.

602(a)(26). The text of section 602(a)(26) is spelled out in footnote 7 of the majority opinion. In interpreting the words "applicant" and "recipient" the following language in section 602(a)(26) is important: "[P]rovide that, as a condition of eligibility for aid, each *applicant* or *recipient* will be required—¶] (A) to assign the State any rights to support from any other person such applicant may have (i) in his own behalf *or in behalf of any other family member for whom the applicant is applying for or receiving aid,* . . ." (Italics added.) Since Congress used the terms "applicant or recipient" in section 602(a)(26) in a manner which distinguishes the caretaker relative (the individual who applies for and receives aid in behalf of family members) from the dependent child (for whom application is made), it is illogical to conclude that Congress intended the identical words to have a different meaning when used in the sister statute (42 U.S.C. § 602(a)(25)) with which we deal. The accepted rule of statutory construction is that statutes on the same or related subject matter must be read and construed together in light of each other, so as to harmonize them if possible. (*Ebert* v. *State of California* (1949) 33 Cal.2d 502, 509 [202 P.2d 1022]; *In re Marquez* (1935) 3 Cal.2d 625, 628 [45 P.2d 342].) This rule is particularly applicable inasmuch as the identical words are used in two closely related subsections passed by the same legislature at the same time. Thus, "applicant and recipient" does not include the children.

Since the terms "applicant" and "recipient" as used in 42 United States Code section 602(a)(25) should not be interpreted to include children receiving AFDC benefits, the Health, Education and Welfare regulation (45 C.F.R. § 232.10) fails as inconsistent with the statute. The state regulation (E.A.S. 50-105.2) similarly fails.

II

The religious foundation of petitioner's belief is not at issue in this case. Both the majority, albeit with apparent reluctance, and respondent agree that petitioner's belief is entitled to First Amendment protection. It is therefore incumbent upon this court to approach the issue of whether the regulations in question impermissibly infringe upon petitioner's constitutional right in the same manner it would if this particular belief were a cardinal principle of any of the major organized religions. On the record of this case, accordingly, petitioner is entitled to the same constitutional protection as would be accorded an individual holding beliefs consistent with the major Catholic, Protestant, Jewish, or similar faiths.

Since it is established that petitioner's First Amendment right is affected, the burden that must be shouldered by the state to defend a regulation which infringes on religious activity is a heavy one. Before an infringement can be countenanced, the state must show that its interest in the regulation outweighs petitioner's interest in the free exercise of her religious belief. (*Elrod* v. *Burns* (1976) 427 U.S. 347 [49 L.Ed.2d 547, 96 S.Ct. 2673]; *Sherbert* v. *Verner* (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790].) To meet its burden the state must demonstrate a compelling interest in the regulation. "The interest advanced must be paramount, one of vital importance, . . ." (*Elrod* v. *Burns, supra,* at p. 362 [49 L.Ed.2d at p. 559].) The state must further demonstrate that the regulation represents the least restrictive means of advancing its interests. (*Sherbert* v. *Verner, supra,* at pp. 406-407 [10 L.Ed.2d at p. 972].)

The state has failed to demonstrate a compelling interest in requiring social security numbers for petitioner's children. Respondent asserts that the regulation serves as an aid in the administration of the AFDC program and also that it serves as an aid in detecting welfare fraud. Analogous United States Supreme Court cases indicate that these interests are not sufficient. In *Sherbert* v. *Verner, supra,* the court held that the state's purposes (preventing fraud against the unemployment benefit fund, and inconvenience to employers) were not compelling. The court more recently made clear that administrative convenience does not amount to a compelling state interest. (*Reed* v. *Reed* (1971) 404 U.S. 71 [30 L.Ed.2d 225, 92 S.Ct. 251].)

A federal district court, in a well-reasoned decision, has ruled on a case directly on point. *Stevens* v. *Berger,* (E.D.N.Y. 1977) 428 F.Supp. 896, concludes that the parents' religious belief that social security numbers are a "devise of the Antichrist" or the "mark of the beast" precludes the state from requiring them to acquire social security numbers for their children as a precondition to receiving welfare benefits.

There is no suggestion that a threat exists sufficient in size to compromise the orderly administration of the AFDC program. (*Sherbert* v. *Verner, supra,* at pp. 408-409 [10 L.Ed.2d at p. 973].) We are not faced here with "an administrative problem of such magnitude, [as to] have rendered the entire statutory [and regulatory] scheme unworkable." (*Ibid.*) The detrimental impact of petitioner's action on the system, if any, is diminutive. If the state interest is so compelling, I wonder why Congress did not deal with it statutorily; in fact, we consider only a

regulation.[2] The state, I conclude, has not carried its heavy burden of demonstrating compelling interest. Nor has the state carried its burden of showing that the least restrictive means of attaining the state's purpose has been adopted. (*United States* v. *Robel* (1967) 389 U.S. 258 [19 L.Ed.2d 508, 88 S.Ct. 419].) Petitioner has provided respondent with the birth certificates of her children as well as her own social security number (obtained for her when she was a minor). Identification of the family unit can be adequately achieved with petitioner's number. Furthermore, the children can be identified by their names and birth certificates. Petitioner has also expressed her willingness to cooperate with the state in devising other alternatives of identifying her children. The feasibility of devising such alternatives is suggested by the model adopted by the Internal Revenue Service for identifying clergy who have opted out of the social security system. (*Stevens* v. *Berger, supra,* at p. 907.) The Constitution and First Amendment rights demand that an effort be made.

The sole burden of justifying its limitation on petitioner's fundamental right rests with the state. The state has failed to demonstrate a compelling interest or that the regulations in question represent the least drastic intrusion upon petitioner's constitutional right.

Appellants' petition for a hearing by the Supreme Court was denied December 27, 1979. Mosk, J., and Newman, J., were of the opinion that the petition should be granted.

---

[2]The *Green* court observed: ". . . Congress itself, by the enactment of § 7 of the Privacy Act of 1974, indicated that the disclosure of an SSN is not a trivial precondition to any benefit provided by law. Rather, § 7 makes it unlawful for any governmental agency to deny anyone such benefits on account of the failure to disclose his SSN unless the disclosure is required by federal law. We mention § 7 in this context merely to demonstrate Congress' intention of avoiding unwarranted disclosure of SSN's. Such an intent buttresses our conclusion that if Congress wished to require SSN's from children benefitted by AFDC programs it would have done so explicitly. This inference is particularly strong in light of the fact that the same session of the same Congress enacted both the Social Services Amendments of 1974 and the Privacy Act of 1974." (*Green* v. *Philbrook, supra,* at pp. 839-840.)