Robert Dale CALLAHAN, Plaintiff,

v.

Marion WOODS, Director, California Department of Benefit Payments, Joseph Califano, Secretary, Health, Education and Welfare, Defendants.

No. C–78–1819 WHO.

United States District Court,
N. D. California.

June 27, 1979.

---

Alan Jaroslovsky, Santa Rosa, Cal., Deanna Beeler, Calif. Rural Legal Assistance, Santa Rosa, Cal., for plaintiff.

G. William Hunter, U. S. Atty., Richard de Saint Phalle, Asst. U. S. Atty., San Francisco, Cal., Evelle Younger, Atty. Gen., Winifred Younge Smith, Deputy Atty. Gen., San Francisco, Cal., for defendants.

## MEMORANDUM OPINION

ORRICK, District Judge.

Plaintiff, Robert Dale Callahan, brings this action to enjoin defendants, Department of Benefit Payments ("the Department") and the Department of Health, Education and Welfare ("HEW"), from requiring that he obtain a social security number for his daughter in order to qualify for Aid to Families With Dependent Children ("AFDC") benefits to which his family is otherwise entitled. Callahan claims that the requirement that he take a social securi-

ty number for his daughter interferes with the free exercise of his religion. The unique circumstances of the case called upon the Court to undertake the delicate and difficult task of determining whether or not plaintiff's beliefs were and are sincere and religious in nature. For the reasons hereinafter stated, the Court finds that plaintiff's views, although sincerely held, are not "rooted in religious belief," and therefore do not possess constitutional dimension. Judgment is granted for the defendants in accordance with this Memorandum Opinion, which shall constitute findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.

Plaintiff is married and has two children, ages two and three. Because he is unemployed, his family is entitled to receive, and has received, AFDC benefit payments for both children. On May 10, 1977, the County of Sonoma notified him that benefits would terminate for his youngest child, Serena, for whom he had refused to obtain a social security number. Persistent in his refusal, plaintiff requested a fair hearing before a hearing officer of the Department. On June 8, 1977, the officer found that, although plaintiff was sincere in his religious beliefs, federal regulations mandating the use of social security numbers in the AFDC

program required denial of plaintiff's claim.[1] This decision was adopted by the Department on July 13, 1977.

Pursuant to California Institutions & Welfare Code § 10962,[2] plaintiff sought review of this decision by applying for a writ of mandate in state superior court. The Department moved for joinder of HEW, on grounds that, in light of the above-cited regulations, HEW was the real party in interest. Once the Secretary of HEW ("the Secretary") was joined as a defendant, the action was removed to this Court pursuant to 28 U.S.C. § 1442(a)(1).[3]

Plaintiff has contended throughout his pleadings that the reason for his refusal to comply is solely religious. A member of the West Santa Rosa Baptist Church, he has in recent years become deeply involved in religion. His religious activity includes study of the Bible, in which he claims to have a literal belief. Accordingly, plaintiff asserts that the social security number has become the "mark of the beast" in our society, by which the Antichrist will come to control mankind. As a source of this view, plaintiff cites the Book of Revelations:

"16. [H]e causeth all, both small and great, rich and poor, free and bond, to receive a mark in their right hand, or in their foreheads:

17. And that no man might buy or sell, save that he had the mark, or the name of the beast, or the number of his name;

---

1. Section 402(a)(25) of the Social Security Act, 42 U.S.C. § 602(a)(25) requires:

"(a) A State plan for aid and services to needy families with children must * * * (25) provide (A) that, as a condition of eligibility under the plan, each applicant for or recipient of aid shall furnish to the State agency his social security account number (or numbers, if he has more than one such number), and (B) that such State agency shall utilize such account numbers, in addition to any other means of identification it may determine to employ in the administration of such plan."

2. Section 10962 of the California Welfare & Institutions Code provides:

"The applicant or recipient or the affected county, within one year after receiving notice of the director's final decision, may file a petition with the superior court, under the provisions of Section 1094.5 of the Code of

Civil Procedure, praying for a review of the entire proceedings in the matter, upon questions of law involved in the case. Such review, if granted, shall be the exclusive remedy available to the applicant or recipient or county for review of the director's decision."

3. 28 U.S.C. § 1442(a)(1) provides:

"(a) A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue."

18. Here is wisdom. Let him that hath understanding count the number of the beast: *for it is the number of a man; and* his number *is* Six hundred three-score and six." *Revelations* 13:16–18.

Plaintiff feels that although wisdom came too late to prevent him, his wife, or their first-born child from obtaining social security numbers, his daughter, Serena, ought to be able to make that choice for herself. Accordingly, he refuses to participate in requiring her to take a number.

The government opposes the relief sought on two grounds. First, it argues that plaintiff's beliefs, although they may be sincere, are not "religiously based." The contention is that plaintiff's aversion to the use of numbers developed during his thirteen years of incarceration, and that such views represent a personal, secular philosophy, rather than a religious belief. Second, the government suggests that even if such ideas are entitled to constitutional protection, the government has a "compelling interest" in the integrity of the social security system sufficient to overcome even the strong protection afforded by the First Amendment. In support of this position, the government has submitted the affidavits of two HEW officials, describing in great detail the origins, use and operation of the social security system in the AFDC program.[4]

Few would challenge defendants' assertion that given the size and complexity of the AFDC program, some form of computerized data storage and retrieval system is necessary to enable it to function. Through the social security numbering system, HEW maintains data on more than 260,000,000 accounts, including workers, recipients, employers, states, and other entities. In the AFDC program, 7,500,000 data input operations have been processed since August 1, 1975. In fiscal 1978, $6,311,000,000 was expended in AFDC programs, covering a monthly average of 3,542,000 families. As an example of the confusion which would reign in the absence of unique numerical identifiers, as of March 1, 1979, the social security system contained 59,621 Callahans, 924 Robert Callahans, and 42 Robert D. Callahans.

The tasks necessary to the operation of the system may depend upon a central, computerized data system. These include eligibility verification, proper check payment, and avoidance of benefit duplication or overpayment. Moreover, the social security system permits HEW to coordinate the AFDC program with other federal programs in which recipients are often involved, including Medicaid, the WIN program, and the Child Support Program. Also critical is the ability to exchange information with the states, which are after all the primary administrators of many welfare programs, and many of which, including California, use data processing systems to carry out this function.

Finally, the prevention of fraud in the AFDC program has become an issue of increasing concern in recent years. In fiscal 1977, the Inspector General estimated that $669,000,000 in AFDC payments involved fraud, waste or abuse, including $490,000,000 in overpayments or payments to ineligibles. These figures may significantly understate actual losses, since AFDC eligibility provides access to Medicaid, food stamps, and social services. The government has set before the Court an impressive array of programs which, utilizing the common denominator of social security numbers, are designed to combat this problem. It appears that more such undertakings are anticipated in the near future.

According to the government, the social security system is the only practical means through which to accomplish the variety of objectives outlined above. Given the volume involved, the use of a computerized data system using unique, numerical identifiers has proven necessary, in the eyes of

4. *See* Affidavit of Philip Harant, Director of the Division of Earnings Systems, Social Security Administration, Department of Health, Education and Welfare; Affidavit of Harris G. Factor, Deputy Director of the Office of Regulations, Social Security Administration, Department of Health, Education and Welfare.

the government, to operate the massive AFDC program.

The parties presented these issues in the context of cross-motions for summary judgment. The Court, doubtful of its ability to resolve the sincerity issue without the aid of testimony, ordered an evidentiary hearing on this issue alone. Accordingly, on May 16, 1979, plaintiff took the stand to testify as to the nature and origin of his beliefs. Based upon this testimony, the Court now finds that plaintiff's beliefs are not essentially religious in character, but represent a personal, secular philosophy which plaintiff has attempted to buttress or justify with reference to biblical authority. Measured against the standards by which purported religious beliefs must be tested, such views are not entitled to the protection of the First Amendment.[5]

## II.

■ It is axiomatic that not every belief for which protection is sought under the First Amendment thereby attains constitutional stature. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Stevens v. Berger*, 428 F.Supp. 896, 899 (E.D.N.Y.1977). There exist two threshold requirements which must be satisfied before courts will invoke the careful scrutiny required by the First Amendment:

> "[T]here must be some reasonable possibility 1) that the conviction is sincerely held and 2) that it is based upon what can be characterized as theological, rather than secular—*e. g.*, purely social, political or moral views." *Id.* at 899.

That such requirements exist was recognized by the Supreme Court in *Wisconsin v. Yoder, supra*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15, wherein the Court was called upon to evaluate the claims of the Amish that compulsory education beyond the eighth grade interfered with the exercise of their religion. The Court made clear that the Constitution did not protect views

which were "based upon purely secular considerations," but only those which were "rooted in religious belief." *Id.* at 215, 92 S.Ct. 1526. Elaborating upon this requirement, the Court observed:

> "Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis. Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses." *Id.* at 215–16, 92 S.Ct. at 1533 (footnote omitted).

Hence, although courts are forbidden to inquire into the *validity* of a plaintiff's beliefs, *Stevens v. Berger, supra*, 428 F.Supp. at 899, they have a duty to insure that such beliefs are grounded in religion.

■ Evaluating plaintiff's testimony at the May 16 hearing in the light of these principles, it cannot be said that his objections to the use of social security numbers are "rooted in religious belief." Although plaintiff is sincere, and has not attempted to perpetrate a sham upon the defendants or upon this Court, *cf. Theriault v. Silber*, 391 F.Supp. 578 (W.D.Tex.1975), it is evident that his opposition to the use of numbers arose long before his recent conversion to fundamentalist Christianity. He testified that he had been incarcerated for thirteen of his thirty-one years, and that while in prison, was struck by the pervasive use of identification numbers in lieu of names.

---

5. In light of its disposition of the case, the Court finds it unnecessary to reach the question of whether or not the government's interest in the integrity of the social security system is sufficient to overcome a protected religious practice or belief. However, the Court perceives the issue to be a difficult one in light of the impressive factual material presented by the Secretary. *Cf. Stevens v. Berger*, 428 F.Supp. 896, 905–08 (E.D.N.Y.1977).

He admitted having developed a strong resentment against the use of numbers as identifiers, viewing the process as dehumanizing, and a constant reminder of his captivity. The Court finds that it was this experience, not his subsequent religious activity, which gave rise to plaintiff's belief in the moral impropriety of the social security number.

Plaintiff testified, both on direct and cross-examination, that his aversion to the use of numbers was something which he "felt in his heart," prior to his association with either the Baptist Church or the Bible. He indicated that his discovery, in the Book of Revelations, of the "mark-of-the-beast" passage, was significant in that it "provided support" for his personal views about the use of numbers. Therefore, it is apparent that although plaintiff may now claim these beliefs to be "religious" in origin, they predate any involvement on his part with religion—organized or otherwise. Rather, plaintiff is relying upon concepts admittedly drawn from traditional religious text to justify and support a secular, philosophical objection to the use of social security numbers by the government. In light of the standards set forth in *Yoder* and *Stevens*, this is not the kind of belief or practice which the Constitution was intended to protect.[6]

Accordingly, judgment is granted for the defendants, who shall prepare and lodge with the Court by July 9, 1979, a form of judgment approved by plaintiff.

---

**6.** The Court is, of course, aware that the result it reaches is at variance with the conclusions of Judge Weinstein in *Stevens v. Berger*, 428 F.Supp. 896 (E.D.N.Y.1977). In that case, however, the court was not confronted by the unique facts presented here. Judge Weinstein's exhaustive and admirable analysis focused upon whether the *belief* itself—that the social security number was the weapon of the Antichrist—could properly be characterized as theological in nature. *Id.* at 901–05. Of necessity, he emphasized the belief, not the believer.

There was no question that the Stevens' views evolved from religious experience and Bible study for, as the court noted, "theirs is the world of the spirit, not the flesh." *Id.* at 902. Moreover, the Stevens' faith was reinforced by the teachings of their church. *Id.* at 902.

Here, the evidence is simply otherwise. Plaintiff's beliefs arose in a purely secular context, uninformed by religious training or inspiration. Under such circumstances, the First Amendment does not shield plaintiff from the legitimate commands of the government.