Robert Dale CALLAHAN,
Plaintiff-Appellant,

v.

Marion WOODS, Director California Dept. of Benefit Payments and Joseph Califano, Secretary of Health, Education and Welfare of the United States, Defendants-Appellees.

No. 79–4612.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 10, 1981.

Decided Oct. 5, 1981.

Rehearing Denied Jan. 19, 1982.

Alan Jaroslovsky, Santa Rosa, Cal., for plaintiff-appellant.

Leonard Schaitman, Dept. of Justice, Washington, D. C., for defendants-appellees.

Before ADAMS,[*] GOODWIN and FARRIS, Circuit Judges.

ADAMS, Circuit Judge.

On this appeal we are asked to determine whether the state and federal governments, in requiring Robert D. Callahan to obtain a social security number for his daughter before she could obtain public assistance benefits, even though procuring such a number would contravene what appellant asserts is a sincere religious belief, violated his First Amendment right to the free exercise of religion. Because the district court, 479 F.Supp. 621, in awarding summary judgment for the government, incorrectly construed plaintiff's beliefs as non-religious, we reverse its judgment and remand for a determination of the governments' interest in the regulation.

## I.

Callahan is married and has two children. Following his release from prison in 1974 he was unemployed, and his family became eligible to receive Aid to Families with Dependent Children (AFDC) benefits for both children. The State of California paid those benefits in full until May 10, 1977, when the County of Sonoma notified Callahan that his younger child, Serena, for whom Callahan refused to obtain a social security number, was no longer eligible. Callahan, his wife, and their older child all held social security numbers at the time. The State, in requiring a social security number for AFDC eligibility acted pursuant to the mandate of Section 402(a)(25) of the Social Security Act, 42 U.S.C. § 602(a)(25) (1976).[1]

---

[*] Hon. Arlin M. Adams, United States Court of Appeals for the Third Circuit, sitting by designation.

1. Although we do not reach the issue whether the Social Security Act requires numbers for children on whose behalf parents receive AFDC benefits, we note that courts confronting the issue have construed the statute to mandate issuance of the numbers. *See McElrath v. Califano,* 615 F.2d 434 (7th Cir. 1980); *Green v. Philbrook,* 576 F.2d 440 (2d Cir. 1978); *Doe v. Sharp,* 491 F.Supp. 346 (D.Mass.1980); *Mullaney v. Woods,* 97 Cal.App.3d 710, 718, 158 Cal.Rptr. 902 (1979).

■ Although born a Catholic and raised as a Baptist, Callahan did not develop a strong interest in religion until 1973, while at San Quentin. Since then he has read the Bible for half an hour to an hour each day, and is now a member of the West Santa Rosa Baptist Church. Callahan, who claims to have a literal belief in the Bible, asserts that his refusal to comply with the social security number requirement for Serena is solely religious. He cites in support of his objection to social security numbers a religious text, Chapter 13 of the New Testament *Book of Revelation*, which reads in part:

> 16. [H]e causeth all, both small and great, rich and poor, free and bond, to receive a mark in their right hand, or in their foreheads;
>
> 17. And that no man might buy or sell, save that he had the mark, or the name of the beast, or the number of his name;
>
> 18. Here is wisdom. Let him that hath understanding count the number of the beast: for it is the number of a man; and his number *is* Six hundred three-score *and* six.

According to Callahan, social security numbers are the "mark of the beast"—the sign of the Antichrist who threatens to control the world. To accept a number, he maintains, is to "serve the beast." Callahan acknowledges that his aversion to social security and other personal identification numbers predates his interest in religion. Nonetheless, he asserts that his objection is now religious in nature, that the *Revelation* text articulates a concept that he felt in a more inchoate form before studying the Bible. He and his wife freely accepted social security numbers, but according to appellant they did so before he arrived at his religious understanding. Although Callahan did not wish to obtain a number for his first child he did so, apparently fearing violation of his parole, which terminated in December 1975. Now he believes that, on behalf of Serena,[2] he must observe his religious objections to assigning numbers and preserve her freedom to avoid serving the beast, even though she may well decide later to obtain a number voluntarily.

Upon receiving notification that benefits for Serena would be terminated, Callahan, pursuant to California administrative procedure, sought a hearing before the Department of Benefit Payments. The hearing officer found that Callahan held sincere religious beliefs that militated against issuance of a social security number for his daughter; nonetheless he held that federal regulations required the issuance of such a number before any more benefits could be paid on behalf of Serena. Callahan petitioned the Sonoma Superior Court for a writ of mandamus to compel the payment of those benefits. The Secretary of Health, Education, and Welfare (now Health and Human Services) was joined in that action as the real party in interest, and the case was removed to federal court. In the district court, Callahan and the Secretary filed cross-motions for summary judgment. The judge held an evidentiary hearing, consisting of live testimony by the plaintiff. On the basis of that hearing as well as the pleadings and affidavits previously filed, the court found that Callahan's views on the undesirability of personal identification numbers were, though sincere, not religious in nature. Rather, he found that they were primarily manifestations of a personal, secular philosophy developed during Callahan's thirteen years of incarceration. The court concluded that although Callahan relied upon "concepts admittedly drawn from traditional religious text," he did so only "to justify and support a secular, philosophical objection to the use of social security numbers by the government." *Callahan v. Woods*, 479 F.Supp. 621, 625 (N.D.Cal.1979). Consequently the court granted the government's summary judgment motion, holding that the state, in requiring Callahan to acquire a number for Serena before she could receive AFDC benefits, did not burden a protected interest.

---

**2.** Parents may exercise constitutional rights on behalf of their children. *See Wisconsin v. Yoder*, 406 U.S. 205, 232–34, 92 S.Ct. 1526, 1541– 42, 32 L.Ed.2d 15 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925).

## II.

██ A religious claim, to merit protection under the free exercise clause of the First Amendment,[3] must satisfy two basic criteria. First, the claimant's proffered belief must be sincerely held; the First Amendment does not extend to "so-called religions which . . . are obviously shams and absurdities and whose members are patently devoid of religious sincerity." *Theriault v. Carlson*, 495 F.2d 390, 395 (5th Cir. 1974), *cert. denied*, 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974); *see Stevens v. Berger*, 428 F.Supp. 896, 899 (E.D.N.Y.1977). Second, as the Supreme Court held in *Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1972), the claim must be rooted in religious belief, not in "purely secular" philosophical concerns. *Cf. United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965) (test for religious belief within meaning of draft law exemptions is whether beliefs professed are sincerely held and, in claimant's scheme of things, religious).[4]

██ Initially we are faced with some ambiguity in the district court's application of the two-part test. It found that the plaintiff was sincere in his objection to identification numbers, but that his objection was not "rooted in religious belief." 479 F.Supp. at 624. The court did not explicitly attach its finding of sincerity to a specific idea or claim of Callahan's. Arguably, the court might have meant merely that Callahan sincerely dislikes social security numbers, but sincerity of that sort would be obvious from the very existence of this lawsuit. A First Amendment inquiry into sincerity generally has a different focus, addressing the sincerity with which the claimant holds the allegedly religious belief itself. *See, e. g., Theriault v. Carlson, supra*, 495 F.2d at 394–95. Thus, construed properly the trial court's blanket finding of sincerity must mean that the plaintiff, when he says that he opposes personal identification numbers because they are the "mark of the beast" and tools of the Antichrist, sincerely believes in the diabolical nature of those numbers. The remaining question, then, is whether Callahan's objections are "rooted in" a belief that is religious in nature. *See Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1977).

In purportedly examining whether Callahan's views were "rooted in" his alleged scriptural interpretation, the court focused on issues that in this case were more relevant to the already settled question of sincerity. It is of course imaginable that in some circumstances a person might assert a First Amendment claim and attempt to justify it with a religious belief which, though sincerely held, was simply irrelevant to the claim. For example, *Yoder* involved claims by the Amish that public education for their children after the eighth grade violated their religious beliefs. If in that case the court had determined that the objection of the Amish to education was unrelated to their religious beliefs, then their constitutional claim would have had no merit even though their religious beliefs were sincere. *See Yoder*, 406 U.S. at 215–16, 92 S.Ct. at 1532–33. But just as the Supreme Court found in that case that the claim *was* related to the religious belief of the Amish, 406 U.S. at 215–16, 92 S.Ct. at 1532–33, here the relevance of Callahan's proffered beliefs to his claim is apparent. Indeed, it is hard to imagine how Callahan's belief that social security numbers are the "mark of the beast" could, if sincere, be considered irrelevant to his stand against the issuance of a number for Serena. Once his belief is established as sincere, it would seem undisputable that Callahan's objection must be "rooted in" that belief, at least in part.

---

3. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

4. Though it construed a statute rather than the Constitution itself, *Seeger* is often read as addressing constitutional limits inherent in the draft statute; the case is therefore applicable to First Amendment analysis generally. *See Malnak v. Yogi*, 592 F.2d 197, 203–05 (3d Cir. 1979) (Adams, J., concurring); Note, *Toward a Constitutional Definition of Religion*, 91 Harv.L. Rev. 1056, 1064 & n.56.

Nonetheless, the court concluded that Callahan's objection to identification numbers, although sincere, was actually "rooted in" secular and philosophical concerns. In reaching this result, the court emphasized that Callahan's aversion to identification numbers predated by many years his religious awakening, and found that Callahan's long prison experience was the major impetus to his belief. 479 F.Supp. at 624–25. Distinguishing *Stevens v. Berger, supra,* a case which similarly involved plaintiffs who objected to the issuance of social security numbers for their children on the ground that such numbers were the "mark of the beast," the trial court here noted that in this case:

> Plaintiff's beliefs arose in a purely secular context, uninformed by religious training or inspiration. Under such circumstances, the First Amendment does not shield plaintiff from the legitimate commands of the government.

479 F.Supp. at 625 n.6. This reasoning strongly suggests an underlying premise that a long-held secular belief invalidates First Amendment protection for a related but newly-alleged religious belief.

▮ This premise may in some cases be applicable to the question of sincerity. A person seeking to advance a secular interest might, if frustrated in his pursuit, decide to mask the cause in religious garb in order to bring it under First Amendment protection. The existence of a longstanding philosophical belief which has only recently, and to the claimant's advantage, taken on theological overtones could certainly give rise to reasonable suspicion of dissimulation. If the district court had, after hearing Callahan's testimony, decided that his current objection to social security numbers had nothing to do with the reason proffered,

and thus decided that his claims about the "mark of the beast" were fictitious trappings for his longstanding secular concerns,[5] then the court would be obliged to find him insincere and his claims entitled to no special privilege. But where, as here, the court has found that the allegedly religious belief is sincerely held, the presence of longstanding secular objections does not refute the finding of sincerity any more than it negates in this case the obvious connection between Callahan's allegedly religious belief and his objection to obtaining a number.

▮ Because Callahan's distaste for numbers is longstanding, one might infer that even if he now objects to numbers on scriptural grounds, he opposes them for personal and philosophical reasons as well. But a coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one. In *Yoder* the Supreme Court warned that a belief that is based on "purely secular considerations" merits no protection under the free exercise clause. 406 U.S. at 215, 92 S.Ct. at 1532. It did not limit the scope of the First Amendment to "purely religious" claims; the area of overlap is presumably protected. The devout Seventh-Day Adventist may enjoy his Saturday leisure; the Orthodox Jew or Mohammedan may dislike the taste of pork. Such personal considerations are irrelevant to an analysis of the claimants' free exercise rights, so long as their religious motivation requires them to keep the Sabbath and avoid pork products. Religious duties need not contradict personal values or preferences in order to be protected. It might be argued that Callahan's personal animus toward numbers would by itself have been enough to motivate his refusal to give Serena a number.[6] Even if

---

5. Others have opposed the issuance of social security numbers on wholly secular grounds. *See McElrath v. Califano,* 615 F.2d 434 (7th Cir. 1980) (requiring social security numbers for dependent children as a condition of AFDC benefits does not violate constitutional rights of privacy and equal protection); *Doe v. Sharp,* 491 F.Supp. 346 (D.Mass.1980) (Social security number requirement for AFDC eligibility held

not to violate constitutional right to privacy or statutory language of AFDC statute.); *Green v. Philbrook,* 576 F.2d 440 (2d Cir. 1978).

6. It seems unlikely, however, that Callahan's long-standing secular reasons for objecting to social security numbers would by themselves have prompted the refusal to issue Serena a number; while he held such views he and his wife freely accepted numbers themselves.

this were the case, his sincere objection to burdening her with the "mark of the beast" would provide a separate and sufficient reason for his action, one that, if characterized as religious, merits constitutional protection.[7]

### III.

■ In applying the free exercise clause of the First Amendment, courts may not inquire into the truth, validity, or reasonableness of a claimant's religious beliefs. *See United States v. Ballard*, 322 U.S. 78, 87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944); *Stevens v. Berger*, 428 F.Supp. 896, 899 (E.D.N.Y.1977) ("A religious belief can appear to every other member of the human race preposterous, yet merit the protections of the Bill of Rights.") The Supreme Court has recognized that if the free exercise right were dependent on one's ability to establish the truth of one's beliefs, then the First Amendment guarantees might be rendered illusory. In *Ballard*, leaders of the "I Am" movement, one of whom claimed status as a specially designated messenger of God, were convicted of mail fraud in their solicitations. The Supreme Court held that the district court had acted properly in withholding from the jury any consideration of the truth of the religious statements made and limiting the jury to a determination whether the defendants sincerely believed in their religious assertions. The Court explained:

> The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain.

322 U.S. at 87, 64 S.Ct. at 886.

■ It is nonetheless incumbent on the courts to ensure that a free exercise claim is granted only when the threatened belief is religious in nature. *Wisconsin v.*

*Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1972). While defining religious belief is often quite difficult, *see Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981); *United States v. Seeger*, 380 U.S. 163, 174, 85 S.Ct. 850, 858, 13 L.Ed.2d 733 (1965), there can be little doubt that Callahan's interpretation of social security numbers as tools of the Antichrist is religious in nature.

While many cases have grappled with the difficult problem of identifying nontraditional beliefs that merit protection, *see, e. g., Seeger, supra*, this case presents a matter that in many respects is less difficult to resolve. Although traditional religious beliefs are entitled to no greater protection than many nontraditional dogmas, their status as religious beliefs is often more readily ascertained. Indeed, such doctrines are the standard by which other beliefs are measured for inclusion in the First Amendment guarantee. *See Malnak v. Yogi*, 592 F.2d 197, 207 (3d Cir. 1979) (Adams, J., concurring). And in this case, Callahan's views on social security numbers are closely tied to a theistic belief. Callahan is a member of the Baptist church; his ascription of diabolical status to social security numbers is derived from the New Testament's *Book of Revelation*, a text which his church, and indeed most churches, consider holy.

Callahan's interpretation of the scriptures may differ from the meaning members of his church generally find in that text, but such disagreement cannot itself invalidate his free exercise right. Though the district court did not have available the guidance of the Supreme Court's analysis in *Thomas*, since it was decided after the court's decision, that case establishes that "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." 450 U.S. at 715, 101 S.Ct. at 1431. In *Thomas*, the Court held that a Jehovah's Witness's objection to producing armaments was religiously motivat-

7. St. Augustine and the British writer, G. K. Chesterton, are examples of persons who first had strong philosophical convictions or views that in later life became religious in nature.

ed even though others of his denomination found that work " 'scripturally' acceptable." The Court explained that "it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation." *Id.* 450 U.S. 715–16, 101 S.Ct. at 1431. While this abstention from evaluating the merits of a scriptural interpretation may not be maintained when the claim is so bizarre or so unrelated to the religious nature of the text that it is "clearly nonreligious in motivation," *id.,* in this case a court cannot disregard Callahan's reading as nonreligious. His understanding of the *Revelation* passage is theological and eschatological; it clearly addresses spiritual, not merely worldly, concerns.

Given the close similarity of the ideas involved in this case and those in *Stevens v. Berger, supra,* Judge Weinstein's thorough and compelling analysis of the Stevenses' dogma is fully apposite here.[8] In *Stevens* the plaintiffs, while seeking AFDC benefits for their children, objected to the issuance of social security numbers as a prerequisite to eligibility. They explained that social security numbers were becoming the universal identification number predicted in the *Book of Revelation* as the tool used by the Antichrist to control individuals. The Stevenses feared that obtaining numbers for their children would jeopardize their children's spiritual well-being and threaten their opportunity to enter heaven. 428 F.Supp. at 901–02. Noting that neither widespread adherence nor scriptural support is a prerequisite to constitutionally protected status for a purportedly religious claim, the court nevertheless traced the history of the Jewish and Christian concepts of the Antichrist and found that "The meaning of the mark to theologians—whatever they believe the mark to have been—is strikingly similar to the meaning for the Stevens, who see a potential for abuse of

the spiritual side of humanity in a number which could act as a universal identifier." 428 F.Supp. at 905. It concluded that:

> Since having a social security number in this society has become a prerequisite for so many of the society's benefits (both from the public and private sectors), no great leap of imagination is necessary to travel from the exegesis of *Revelation* to the plaintiffs' belief that such numbers could function, if the state were to become too powerful, like the mark of the Antichrist spoken of in the biblical text. With the history and literature marshalled by plaintiffs to support their contention, their belief must be characterized as religious for purposes of this case.

*Id.* at 905. Though Callahan's interpretation of *Revelation* may not have been as well articulated as the Stevenses' interpretation, it reaches the same conclusions for substantially the same stated reasons. And as the Supreme Court recently held in *Thomas,* a person's free exercise should not be curtailed simply because "his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." 450 U.S. at 715, 101 S.Ct. at 1430.

## IV.

■ It would appear quite clear then that Callahan's views regarding social security numbers as the "mark of the beast" are theological in nature and plainly religious within the meaning of the First Amendment. As the district court found, Callahan sincerely holds those views. It would seem that both requirements of the threshold test for a free exercise claim are satisfied. The appropriate course, therefore, is to determine the extent to which Callahan's protected beliefs were burdened by the government's regulations, consider whether the government has a compelling interest in making social security numbers a prerequisite for AFDC benefits, and decide

---

**8.** The district court here noted the cogency of Judge Weinstein's analysis, and distinguished Callahan's case not because his belief was at variance with the belief of the Stevenses, but

because *Callahan* came to that belief differently. *Callahan v. Woods,* 479 F.Supp. 621, 625 n.6 (N.D.Cal.1979).

if that interest may be satisfied by some less restrictive means.[9] *See Thomas, supra,* 450 U.S. at 715, 101 S.Ct. at 1431.

■ Before it reached this step, however, the district court seemingly applied an additional threshold requirement: that a claimant's belief must be of religious *origin* in order to fall within the ambit of the First Amendment. The court found that "although plaintiff may now claim [his] beliefs to be 'religious' in origin, they predate any involvement on his part with religion—organized or otherwise," 479 F.Supp. at 625. But the correct standard is not whether Callahan's beliefs have *always* been religious; they need only be religious in the context of his life as he now lives it. *Cf. Seeger, supra,* 380 U.S. at 184, 85 S.Ct. at 863 (test for religious exemption under draft statute is whether objector's beliefs play a role in his life similar to that of more traditional theological beliefs). *See generally* Note, *Toward a Constitutional Definition of Religion,* 91 Harv.L.Rev. 1056 (1978).

■ If judicial inquiry into the truth of one's religious beliefs would violate the free exercise clause, *see United States v. Ballard, supra,* 322 U.S. at 87, 64 S.Ct. at 886, an inquiry into one's reasons for adopting those beliefs is similarly intrusive. So long as one's faith is religiously based at the time it is asserted, it should not matter, for constitutional purposes, whether that faith derived from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible. Nor can the courts easily distinguish between beliefs springing from religious and secular origin.[10] A secular experience can stimulate a spiritual response; lives are not so compartmentalized that one can readily keep the two separate. It may well be that Callahan first developed an aversion to numbers when he felt their dehumanizing effect in prison. If later study or inspiration has provided him with an additional, theological objection to numbering people, then his present belief developed out of secular and religious elements that cannot be disentangled. In any event, constitutional protection cannot be denied simply because earlier experience has left him particularly open to his current religious belief.

V.

Inasmuch as Callahan's objections to acquiring a social security number for his daughter are sincerely held and religious in nature, we reverse the holding of the district court and remand for a determination, in light of *Thomas,* of the extent to which Callahan's protected belief is burdened by the government's requirement, and whether the government here is following the "least restrictive means of achieving some compelling . . . interest," *Thomas, supra,* 450 U.S. at 718, 101 S.Ct. at 1432.

---

**9.** Courts conducting this balance on facts similar to those involved here have reached different results. *Compare Stevens v. Berger,* 428 F.Supp. 896 (E.D.N.Y.1977) (government must devise alternative to social security numbers for those few who, like plaintiffs, object to such numbers as the "mark of the beast"), *and Mullaney v. Woods,* 97 Cal.App.3d 710, 158 Cal. Rptr. 902 (1979) (government's interest in comprehensive numbering system for AFDC benefits is compelling and unachievable by less restrictive means, and thus overcomes "incidental infringement" of plaintiff's religious belief that social security numbers are the "mark of the beast").

**10.** Courts are ill-equipped to discriminate according to the psychological basis for a religious faith. *See* Clark, *Guidelines for the Free Exercise Clause,* 83 Harv.L.Rev. 327, 342–43 (1969).