**John C. LEAHY, Jr., Plaintiff,**

**v.**

**The DISTRICT OF COLUMBIA, Defendant.**

**Civ. A. No. 83–2907.**

United States District Court, District of Columbia.

Oct. 17, 1986.

Neal Goldfarb, Washington, D.C., for plaintiff.

Leslie Nelson, Asst. Corp. Counsel, D.C., Washington, D.C., for defendant.

OPINION

JUNE L. GREEN, District Judge.

This matter is before the Court on plaintiff's motion for summary judgment, defendant's opposition thereto, plaintiff's reply, and the entire record herein. For the reasons stated below, the Court denies plaintiff's motion for summary judgment.

### I. *Findings of Fact*

Plaintiff filed this action on September 30, 1983, alleging violations of the First Amendment to the Constitution and 42 U.S.C. § 1983, against the District of Columbia. Plaintiff seeks declaratory and injunctive relief and money damages.

The facts of this case are straightforward and there is no genuine issue of material fact. According to the complaint, the plaintiff applied for a District of Columbia driver's license on or about April 5, 1983. The District of Columbia Municipal Regulations, 18 D.C.M.R. § 103.2, require, *inter alia,* that each applicant for a driver's license provide his or her Social Security number and pass various tests, such as those for eyesight and driving ability. *See* Complaint, Exhibit A. Plaintiff refused to provide his Social Security number to the licensing examiner because of his religious objection to the undue use of that number. However, he did offer his passport and birth certificate as alternative means of identification. The licensing examination supervisor refused to administer the required tests to plaintiff due to his noncompliance with the regulations and he was denied a driver's license.

Two days later, on April 7, 1983, plaintiff wrote a letter to Marion Barry, Mayor of the District of Columbia, recounting the above occurrences. The letter also contained a request that plaintiff's application for a driver's license be processed notwithstanding his failure to provide his Social Security number. Mayor Barry forwarded this letter to Thomas Downs, Director of the District of Columbia Department of Transportation. Mr. Downs responded to plaintiff's letter on May 6, 1983, and denied him permission to withhold his Social Security number in applying for a driver's license.

Plaintiff "believes that use of his social security number for any purpose not related to the administration of his social security account would endanger his chances of being chosen for life after death." Plaintiff's Statement of Material Facts Not in Dispute ("Plaintiff's Facts") ¶ 8. Based upon his study of the Bible, plaintiff believes that Social Security numbers may constitute "the mark of the beast" and that those who bear it will be denied life after death. He refuses "to provide his social security number for any purposes other than the withholding of social security tax" and "does not use it on income tax returns, on applications for credit, or in banking." Plaintiff's Facts ¶ 12.

Plaintiff has now moved for summary judgment. He argues that the District of Columbia's denial of a driver's license based on his failure to supply his Social Security number constitutes a violation of his first amendment right to the free exercise of his religion. Additionally, plaintiff contends that the requirement is not the least restrictive alternative to promote a compelling governmental interest because the Department of Transportation already has an alternative system of identification numbers that it could have used with respect to Mr. Leahy. He claims that because he could not legally operate a motor vehicle, he suffered great loss and hardship in his business and personal life.

Plaintiff seeks a declaratory judgment that the requirement of 18 D.C.M.R. § 103.2 that a driver's license applicant provide his Social Security number is unconstitutional as applied to him. Furthermore, plaintiff seeks a permanent injunction against the District of Columbia preventing it from requiring him to provide his Social Security number as a condition for applying for a driver's license. He also seeks compensatory damages in the amount of $25,000, an award of court costs, including reasonable attorney's fees, and further relief as may seem just.

Defendant opposes plaintiff's motion. It argues that plaintiff's asserted religious objection to disclosing his Social Security number is not sincere but "is merely a secular belief of long standing, enhanced by secular, tax-related motives." Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment ("Defendant's Opposition Memo") at 11. Moreover, defendant contends that the District of Columbia government has a compelling interest in requiring disclosure of Social Security numbers on applications for drivers' licenses. The compelling interest is "the public safety objective of assuring that those who apply for a driver's license are competent, safe drivers, that they are eligible for a driver's license, and that they are, in fact, who they purport to be." *Id.* at 17. Given its unique nature, defendant asserts that the Social Security number is "the *only* means of achieving that objective with the degree of certainty necessary in today's highly mobile society." *Id.*

Defendant also takes exception to plaintiff's assertion that a viable alternative identification number system is available to religious objectors like himself. It states that "[t]he exception made for diplomats to the social security number disclosure requirement is not relevant to this case. Diplomats are a small, discrete group, whose identity has been certified to the defendant by their governments and by the United States Department of State." Defendant's Opposition Memo at 18. To allow plaintiff "[t]o extend the exception beyond this discrete body would subvert the entire purpose of license permit control." *Id.*

Finally, defendant contends that plaintiff's allegations of damages are not supported by the facts of the case. The specifics of plaintiff's unusual damages claim will not be discussed given the Court's decision on the motion.

## II. *Conclusions of Law*

 To merit protection under the free exercise clause of the first amendment, a religious claim must satisfy two basic criteria. First, the claimant's proffered belief must be sincerely held. *Callahan v. Woods,* 658 F.2d 679, 683 (9th Cir.1981) (citing *Theriault v. Carlson,* 495 F.2d 390, 395 (5th Cir.), *cert. denied,* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974)). *Second,* the claim must be rooted in religious belief not in "purely secular" philosophical concerns. *Wisconsin v. Yoder,* 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533–34, 32 L.Ed.2d 15 (1972). A court may not inquire into the truth, validity, or reasonableness of a claimant's religious beliefs. *See United States v. Ballard,* 322 U.S. 78, 87, 64 S.Ct. 882, 886–87, 88 L.Ed. 1148 (1944).

Defining what is a sincere religious belief can be quite difficult. "Although a religious belief requires something more than a purely secular philosophical or personal belief ... courts have approved an expansive definition of religion." *Quaring v. Peterson,* 728 F.2d 1121, 1123 (8th Cir. 1984) *aff'd,* 472 U.S. 478, 105 S.Ct. 3492, 86 L.Ed.2d 383 (1985) (citations omitted). *See also Wisconsin v. Yoder,* 406 U.S. at 215–16, 92 S.Ct. at 1533–34 (1972); *Founding Church of Scientology v. United States,* 409 F.2d 1146 (D.C.Cir.), *cert. denied,* 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969).

The essence of plaintiff's alleged religious beliefs are as follows: Mr. Leahy "believes in God," and "believes that Christ is God's son, and that there will be a final judgment, at which time the dead will rise, and God will select a few to enjoy eternal life." Plaintiff's Facts ¶ 1. Plaintiff wants to be chosen for eternal life. He also believes that the *Book of Revelation* is a prophesy of the events that will lead up to the final judgment.

According to plaintiff, *Revelation* "refers to several 'beasts,' which represent earthly powers or governments. Revelation says that the second beast will force people to accept a 'mark' or 'number.' It further states that eternal life will be denied to those who accept the 'Mark of the Beast'." Declaration of John C. Leahy, Jr. in Support of Motion for Summary Judgment ("Leahy Declaration") at 2.

The scriptural basis for plaintiff's beliefs is found in the Thirteenth and Fourteenth Chapters of *Revelation*. Chapter Fourteen of *Revelation* states, *inter alia,*

9. And the third angel followed them, saying with a loud voice, If any man worship the beast and his image, and receive his mark in his forehead, or in his hand,

10. The same shall drink of the wine of the wrath of God, which is poured out without mixture into the cup of his indignation; and he shall be tormented with fire and brimstone in the presence of the holy angels, and in the presence of the Lamb:

11. And the smoke of their torment ascendeth up for ever and ever: and they have no rest day or night, who worship the beast and his image, and whosoever receiveth the mark of his name.

*Revelation* 14:9–11 (King James). Chapter Thirteen further provides,

16. And [the beast] causeth all, both small and great, rich and poor, free and bond, to receive a mark in their right hand, or in their foreheads:

17. And that no man might buy or sell, save he that had the mark, or the name of the beast, or the number of his name.

*Id.* 13:16–17.

Plaintiff believes that "[t]he mark of the beast will be imposed by a government by economic pressure," and "[i]t may take the form of a stamped mark that must be put onto commercial documents, and may also serve for personal identification." Leahy Declaration ¶ 6(a). He believes that "the characteristics of social security numbers closely resemble those of the mark of the beast." *Id.* at 7. Plaintiff is not "absolutely positive that the social security number is the mark of the beast," *id.*, but is unwilling to risk losing his chance for resurrection and life after death through the unrestricted use of that number for purposes other than the administration of his Social Security account.

Several courts have already examined similarly held views concerning the "mark of the beast" and found in those instances that it was a sincere religious belief. In *Stevens v. Berger*, 428 F.Supp. 896 (E.D.N.Y.1977), Judge Weinstein analyzed thoroughly "the mark of beast" dogma espoused here by plaintiff. He traced the history of the belief from its source in the *Book of Revelation* through its meaning in the early Christian Church. Judge Weinstein concluded,

Since having a social security number in this society has become a prerequisite for so many of the society's benefits (both from the public and private sectors), no great leap of imagination is necessary to travel from the exegesis of *Revelation* to the plaintiffs' belief that such numbers could function, if the state were to become too powerful, like the mark of the Antichrist spoken of in the biblical text. With the history and literature marshalled by plaintiffs to support their contention, their belief must be characterized as religious for purposes of this case.

*Stevens v. Berger*, 428 F.Supp. at 905. Likewise, the court in *Callahan v. Woods*, 658 F.2d at 686, held that the plaintiff's understanding of "the mark of the beast" passage of *Revelation* was "theological and eschatological" and "it clearly addresses spiritual, not merely worldly, concerns."

While Mr. Leahy's explanation of his "mark of the beast" beliefs may not be as well documented or articulated as those in the *Stevens* and *Callahan* cases, they draw from the same primary source and reach the same conclusion for essentially the same reasons. "A person's free exercise should not be curtailed simply because 'his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ.'" *Callahan*, 658 F.2d at 686 (quoting *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 715, 101 S.Ct. 1425, 1430–31, 67 L.Ed.2d 624 (1981)). Accordingly, the Court finds that plaintiff's views that the Social Security number is a tool of the Antichrist is religious in nature.

The Court also concludes that plaintiff's religious belief is one held sincerely by him. As mentioned previously,

> [s]ince arriving at his present views, [plaintiff] has refused to supply his social security number for any purpose except the administration of his social security account.... As a result he has experienced various hardships. He has been denied credit on occasion, and has had difficulties in banking.... In addition, he does not receive tax refunds to which he is otherwise entitled.... While he lived in Virginia, he was even denied the right to register to vote.

Motion for Summary Judgment Memo at 5. It appears to the Court that plaintiff's willingness to subject himself to these types of inconvenience is rooted in the observance of his sincere religious belief. The fact that plaintiff's secular views on Social Security numbers may be tied closely to a theistic belief does not alter this conclusion. "Religious duties need not contradict personal values or preferences in order to be protected." *Callahan v. Woods*, 658 F.2d at 684.

■ Next, the Court must address the main issue presented by plaintiff's complaint: whether the District of Columbia government's Social Security number requirement for a driver's license application is a violation of plaintiff's constitutionally protected free exercise clause rights under the first amendment where such a requirement is antagonistic to his sincere religious beliefs. Plaintiff and defendant both analyzed this issue under the "least restrictive means" test utilized in the past by many courts in cases involving claims of religious infringement. *See Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); and *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1969). This strict standard requires the government to justify enforcement of the use of a particular statutory requirement as the least restrictive means of accomplishing a compelling state interest. The Court finds,

however, that application of that test is not proper in the instant case.

During the course of this case, the Supreme Court decided *Bowen v. Roy*, —— U.S. ——, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), a case strikingly similar to the one at hand. "The question presented [in *Bowen* was] whether the Free Exercise Clause of the First Amendment compels the government to accommodate a religiously-based objection to the statutory requirements that a Social Security number be provided by an applicant seeking to receive certain welfare benefits and that the States use these numbers in administering the benefit programs." *Id.* at 2149. The plaintiffs in *Bowen* argued that use of a Social Security number for their two-year-old daughter, Little Bird of the Snow, would violate their Native American Indian religious beliefs.

Little Bird's parents believed that technology is "robbing the spirit of man" and that in order for her to obtain greater spiritual power, she must keep her person and spirit unique. The father testified in the lower court that "the uniqueness of the Social Security number as an identifier, coupled with the other uses of the number of which she has no control, will serve to 'rob the spirit' of his daughter and prevent her from attaining greater spiritual power." *Id.* at 2150.

The Supreme Court held in *Bowen* that the test applied in cases like *Wisconsin v. Yoder*, *Thomas*, and *Sherbert* was not appropriate in that instance. "In the enforcement of a facially neutral and uniformly applicable requirement for the administration of welfare programs reaching many millions of people, the Government is entitled to wide latitude." *Bowen*, 106 S.Ct. at 2156.

The Court rejected the test used in *Sherbert* and *Thomas* because the statutory conditions presented in those two cases were different from those in *Bowen*. The statute in *Sherbert* and *Thomas* "provided that a person was not eligible for unemployment compensation benefits if, 'with-

out good cause,' he had quit work or refused available work. *The 'good cause' standard created a mechanism for individualized exemptions." Id.* (emphasis added). The Court went on to state that "[i]f a state creates such a mechanism, its refusal to extend an exemption to an instance of religious hardship suggests a discriminatory intent." *Id.* The Court then enunciated a new test under which to analyze cases like *Bowen.* This test states that "[a]bsent proof that an intent to discriminate against particular religious beliefs or against religion in general, the Government meets its burden when it demonstrates that a challenged requirement for governmental benefits, neutral and uniform in its application, is a reasonable means of promoting a legitimate public interest." *Id.*

No such individualized exemptions exist in the statutory scheme at issue in this case. Unlike *Sherbert* and *Thomas,* there is no statutory mechanism in the instant case which gives any ordinary District of Columbia driver's license applicant a right to refrain from giving his Social Security number to the licensing officials upon a showing of "good cause" or some other standard.

Plaintiff points to the District's method for the issuance of diplomatic driver's licenses as a statutory exemption from the Social Security number requirement. He argues that "the District's existing procedures for issuing diplomatic driver's licenses provide an alternative system of identifying drivers that does not use social security numbers," and "the District could easily have issued Leahy a license that did not state his social security number, without incurring the burden of establishing new procedures just for him." Motion to Dismiss at 21. Plaintiff also states that "there is precedent within the Motor Vehicle Bureau for using the diplomatic license numbers for non-diplomatic drivers when necessary *due to unusual circumstances." Id.* (emphasis added).

The Court notes with interest that the precedent to which plaintiff refers involved instances where one Social Security number had been *submitted* by two different people. Mr. James Harford, then-Acting Chief of the Permit Control Division, Public Works, District of Columbia Bureau of Motor Vehicle Services, explained how his department handles this type of situation during a deposition conducted by plaintiff's counsel.

Q[:] Are there any other categories of people or any other instances where drivers' licenses are issued without the person providing a Social Security number or Social Security card?

A[:] If there's a problem with a possible duplicate of Social Security number that's not through the fault of the Social Security office, where we have accepted certain documents that had been altered or something of that nature, and an individual comes in and shows that they have the correct information, someone may have gotten a driver's license using their number, *we may issue the person a certain number long enough for that person to be able to drive until we clear up the other incident.*

. . . .

Q[:] Could you tell me the kind of arrangements that are made in those situations where a second applicant comes in and presents the same number that someone else has? What arrangements are made to give him a license while you are investigating?

A[:] I would issue a number under the diplomatic numbers *for a temporary period of time until the problem is rectified.*

. . . .

Q[:] To what extent has there been a problem with duplicate Social Security numbers, like you explained or people fraudulently using the wrong number?

A[:] It's been minimal.

Q[:] Pardon me?

A[:] Minimal.

Q[:] Can you put any kind of number on that as to how many times this might come up in a single year?

A[:] Four times a year possibly?

Q[:] How many licensed drivers are there in D.C. now?

A[:] I believe there's probably 350,-000.

James Harford Deposition at 22–23, 25, 27–28.

The foregoing excerpts demonstrate clearly the very limited nature of the exception made by the defendant in situations involving a duplicate Social Security number. Where a Social Security number has been *submitted* by one too many persons as a result of a clerical error, intentional fraud, or other reason, the Bureau of Motor Vehicles issues a *temporary license* until matters are sorted out. Once the correct Social Security number is determined for the persons involved, that number is submitted to the Bureau of Motor Vehicles for appropriate processing.

The only instance where *no Social Security number* is submitted is where it involves the issuance of a license to a diplomat. In that case, the identification of the diplomat is certified by his respective government to the United States Department of State which in turn verifies it with the Bureau of Motor Vehicles. This is the procedure followed in lieu of the submission of a Social Security number. Given the unique nature of the District of Columbia as the Nation's capital and host to many foreign embassies and their staff members, and the special identification verification by the State Department, the Court finds that defendant's practice of exempting this relatively small and discrete group from the Social Security number requirement is very different in nature from those statutory exemptions at issue in *Sherbert* and *Thomas*. Any "discrimination" which results from this practice is based solely on the nondiplomatic status of an applicant and not his religious belief or some other personal characteristic. For this reason, the Court follows the lead of the Supreme Court in *Bowen* and holds that the "least restrictive means" test used in *Wisconsin v. Yoder, Sherbert,* and *Thomas* is not applicable in this matter.

The Court will analyze the facts of the case under the new test enunciated in *Bowen.*

A close examination of the facts of this case reveals that plaintiff has failed to show, as required, that defendant intended to discriminate against his particular religious belief or against religion in general. The licensing regulations require all nondiplomatic applicants to submit their Social Security number without exception. Moreover, the defendant has met its required burden since it has demonstrated that its challenged requirement for a driver's license is a reasonable means of promoting a legitimate public interest. The unique nature of the Social Security number as a national numerical identifier, used in conjunction with the various computer systems with which traffic-related information is exchanged both locally and nationally, promotes a legitimate public interest—public safety. The efficient operation of the internal affairs of the Bureau of Motor Vehicles and the computer systems utilized by the Bureau depend on the use of unique numerical identifiers like the Social Security number. *See* Harford Deposition at 33–34, 46–53.

"[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government." *Bowen* at 106 S.Ct. at 2152 (quoting *Sherbert v. Verner,* 374 U.S. at 412, 83 S.Ct. at 1798 (Douglas, J., concurring)). "The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Id.* For this reason and in light of the holding in *Bowen,* the Court finds that defendant's licensing regulation which requires the submission of a Social Security number by a driver's license applicant is not a violation of plaintiff's constitutional rights. The Court, therefore, denies plaintiff's motion for summary judgment. Also, the defendant's pending motion to dismiss is moot in light of the Court's decision today.